---

(No. 11515.—Judgment affirmed.)
THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* LEE BUCKNER, Plaintiff in Error.

*Opinion filed December 19, 1917.*

1. CRIMINAL LAW—*an indictment may be quashed where record fails to show the grand jury was sworn.* An indictment may be quashed, on motion, where the record fails to show the grand jury was duly summoned, empaneled and sworn.

2. SAME—*a statute of limitations in criminal prosecutions is an act of grace.* A statute limiting the time in which a criminal prose-. cution may be brought is an act of grace and not a contract with the criminal, and it may be changed or repealed by the legislature as to anyone whose right to immunity has not become absolute by the completion of the period of limitation.

3. SAME—*purpose of Statute of Limitations for the bringing of criminal prosecutions.* The Statute of Limitations applicable to criminal cases is enacted for the purpose of allowing the accused to defend himself while the charge is new and the evidence can be more readily obtained, and is not grounded upon mere delay in the prosecution but rather upon delay in commencing the same.

4. SAME—*indictment need not be valid to toll operation of statute under section 6 of division 4 of Criminal Code.* To toll the operation of the Statute of Limitations under section 6 of division 4 of the Criminal Code during the pendency of an indictment which has been quashed, the indictment quashed need not necessarily have been a valid one.

5. SAME—*any testimony directly showing guilt of defendant is competent.* Whatever testimony tends directly to show defendant guilty of the crime charged is competent, the test of admissibility being the connection of the facts proved with the offense charged.

WRIT OF ERROR to the Circuit Court of Wayne county; the Hon. JULIUS C. KERN, Judge, presiding.

CREIGHTON & THOMAS, and ARTHUR POORMAN, for plaintiff in error.

Mr. CHIEF JUSTICE CARTER delivered the opinion of the court:

An indictment was returned at the October, 1911, term of the circuit court of Wayne county against plaintiff in error for the crime of statutory rape. At about that time he left the State and was not found until the spring of 1916, when he was located in Missouri and brought back to this State for trial under said indictment. At the October term, 1916, of said circuit court the indictment was quashed on motion of plaintiff in error. At the same term of court the grand jury, being then in session, returned against him another indictment containing four counts, for the same offense. On motion of plaintiff in error the first and fourth counts were quashed and he plead not guilty to the second and third. The State elected to prosecute him on the second count, and he was tried and found guilty under that count and sentenced to the penitentiary at Chester, Illinois, for the period of five years. This writ of error has been sued out to review the judgment of the trial court.

The evidence upon which the jury found plaintiff in error guilty is substantially as follows: In June, 1911, plaintiff in error was a minister of the Methodist Protestant denomination and pastor of the Wayne City and Hopewell churches of that denomination, in Wayne county. The prosecutrix's name at the time the offense was committed was Mary E. Johnson. At the time of the trial she had recently been married to a man named Schell. At the time of the alleged offense she was fourteen years of age and had recently been taken into the church of which plaintiff in error was pastor and of which her father and mother were both members. In the early part of June, 1911, plaintiff in error went to the home of W. H. Johnson, father of the prosecutrix, and obtained the consent of her parents for her

to accompany him to his home to act as company for his
wife while he was away for a week. On Friday evening,
June 9, 1911, plaintiff in error returned home, and on the
following Saturday morning he hitched a black horse to a
single top-buggy and with his wife and two children and
the prosecutrix in the buggy drove north out of Wayne
City, where he then resided. After driving about two miles
north he let his wife and children out of the buggy and
they walked west about half a mile to the home of Ed.
Woolever. Plaintiff in error drove on north with the prose-
cutrix with the ostensible purpose of taking her to her home.
After driving about a mile further north, to what is known
as the Matthews corner, where he should have gone east
to take the prosecutrix home, he told her he wished to drive
west to the home of James Brocher to get some money for
the church. Upon arriving at the home of Brocher he drove
past, telling the prosecutrix that Brocher was working in
the woods about a half mile further west and that he would
have to go there. When the plaintiff in error was passing
the Brocher home he was seen and recognized by Thomas
Bailey, Brocher's father-in-law. Just over the fence on the
south side of the road on which plaintiff in error was driv-
ing, and just east of the woods, two farmers, Clevenger and
Singleterry, were planting corn. As plaintiff in error drove
past they both recognized him and had a word or two of
conversation with him, and Clevenger recognized the girl.
Singleterry and Bailey also saw her but did not know her
at the time. Plaintiff in error drove on west to a tract of
timber which was on the south side of the road. His horse
and buggy were seen to enter and leave the woods about
that time by a witness named Sherman Harris, who was
planting corn about a quarter of a mile west and on the
other side of the road. Plaintiff in error drove into the
timber about one hundred feet and tied his horse to a tree
where the underbrush obstructed the view from the road.
He went to the buggy, took out a lap robe, spread it upon

the ground and asked the prosecutrix to get out and have
sexual intercourse with him.  She testified that at first she
refused and said it wasn't right and she did not wish to do
so; that he explained it was not wrong for her to have in-
tercourse with him, a minister of the gospel, and told her it
wouldn't hurt her.  After about five or ten minutes' per-
suasion plaintiff in error prevailed upon the prosecutrix
to get out of the buggy, and he then laid her on the lap
robe upon the ground and had sexual intercourse with her.
When the act was consummated he obtained from the prose-
cutrix a promise never to tell of the crime and then drove
with her back along the road east, again passing and talking
to Clevenger and Singleterry, and arrived at the Johnson
home about eleven o'clock.  He watered his horse and talked
briefly with Mrs. Johnson, and although asked to remain to
dinner said he could not do so and left immediately, arriv-
ing at Woolever's about noon, where his wife asked why
he had been gone so long.  On the following Monday, in a
conversation by plaintiff in error in the presence of Cleven-
ger, Singleterry and Woolever, when they joked him about
going into the woods with a girl, he became quite angry and
told them he went into the woods to collect twenty-five cents
from Brocher to pay the president of the church; that it
wasn't right to joke him about that in the presence of any-
body, as Johnson would be mad about it.

Upon the following Tuesday Clevenger was passing
through the woods in question and noticed where the buggy
had gone on the Saturday previous.  He followed the tracks
into the woods and came to the place where the horse had
been tied.  · The ground being low, wet, bottom land, the
buggy and horse had made tracks about an inch and a half
deep.  He observed the prints of a cloth on the ground near
where the buggy had been standing and the impression in
the ground where a human body had been lying upon it.
Just east of where the cloth had been were marks on the
ground from one to two inches deep that had been made

by the toes of a man's shoe, and also marks of a man's and woman's shoes where parties had alighted from the buggy. He also observed tracks made by a horse when tied to the tree, and observed tracks both going in and coming out therefrom, and noticed that the horse that made the tracks had been shod on the front feet with heavy toes in front. He apparently had examined Buckner's horse before this, when Buckner was trying to sell the horse to him, and observed that the horse was shod with heavy toes in front, and said that from his observation the tracks in the woods were made by Buckner's horse. He also said there was only one horse and buggy track going into and returning from the woods at that place. On the following Wednesday, Singleterry, Ed. Woolever, P. C. Green and Clevenger went to the woods and there the other three parties observed the same marks on the ground as Clevenger. Green measured the horse-tracks in the woods and then measured the track which had been made by Buckner's horse on the day of the alleged crime, in a small ditch at the side of the road east of Woolever's home where Green and Buckner had stopped to talk, and the measurements and appearance of the tracks were identical.

After seeing these tracks in the woods Clevenger told Johnson, the father of the prosecutrix, what he had seen and had been told by Buckner, and Johnson immediately asked his daughter about it and she then told him of the alleged crime. A complaint was filed before a justice of the peace and a warrant issued for the arrest of Buckner on or about June 15, 1911. The warrant was placed in the hands of the sheriff, who went to the home of Buckner in Wayne City and made a search for him. Buckner at that time was about five miles away, where he was apparently notified that the crime had been discovered and that a warrant was in the hands of the sheriff for his arrest. He then got the person he was visiting to take him to the nearest railroad station and he fled from the State. Warrants were in the hands

of the Wayne county sheriff continuously from the time the first was issued until Buckner's arrest, in 1916. Warrants were also during that time sent to different counties in Illinois, and some to other States, for the arrest of Buckner, without results, until he was finally located in Missouri in April, 1916, where he was arrested. Requisition papers were issued by the Governor of Illinois, but Buckner came without obliging the sheriff to have them honored by the Governor of Missouri. Buckner had been in Missouri most of the time since August, 1912, and on his return to this State he told the sheriff who brought him about his eluding a former sheriff, Anderson, when Anderson was looking for him in Missouri. He also told the sheriff that he went west with the prosecutrix from the Matthews corner on the day of the alleged crime.

On the trial plaintiff in error took the stand in his own behalf and admitted driving north on June 10, 1911, with his wife and children and the prosecutrix and letting his wife and children out of the buggy to go to Woolever's at about ten o'clock, and testified that he then drove to the home of the prosecutrix, a distance of about two miles, and returned immediately to Woolever's, arriving there about noon, having traveled about four miles and consuming two hours in doing so. He denied driving west from the Matthews corner, or having seen Clevenger, Singleterry and Bailey on that day, or having the conversation at the home of Woolever on the Monday following, and denied having had intercourse with the prosecutrix. He admitted receiving the note on Thursday, June 15, 1911, that there was a warrant out for his arrest, and getting the person on whom he was calling to take him to a town on another railroad so he could leave. The father of plaintiff in error testified that he came to Wayne City on Saturday, June 17, and took plaintiff in error's wife and children, her household furniture and the black horse in question back home with

him to Clark county, where he then lived. He testified that at the time the black horse was not shod.

The principal question urged by counsel for plaintiff in error is that the conviction was barred by the Statute of Limitations, for the reason that the indictment under which he was tried was returned more than three years after the commission of the alleged crime. Section 3 of division 4 of the Criminal Code provides that all indictments for felonies of this character must be found within three years next after the commission of the crime. (Hurd's Stat. 1916, p. 938.) It is conceded by the State that the indictment here in question was returned more than three years after the commission of the alleged offense, but it is insisted that the running of the statute was arrested by section 6 of said division 4, which reads: "When an indictment, information or suit is quashed, or the proceedings on the same are set aside, or reversed on writ of error, the time during the pendency of such indictment, information or suit, so quashed, set aside or reversed, shall not be reckoned within the time limited by this act, so as to bar any new indictment, information or suit for the same offense."

Plaintiff in error insists that the first indictment returned against him did not toll the operation of the statute, for the reason that the record shows that the grand jury by which it was returned was not sworn, as required by law. The record in this case shows with reference to the organization of the grand jury at the October term, 1911, as follows: "And now on this 16th day of October, A. D. 1911, comes the sheriff of Wayne county and returns into open court the names of the persons who were summoned by him according to law to serve as grand jurors for the circuit court of Wayne county for the October term, A. D. 1911, being as follows, to-wit, [naming twenty-three different individuals,] who, on being called, all answered to their names and are by the court charged touching their present service, whereupon Ed. Keen was by the court designated as fore-

man and R. F. Bogle officer in charge." It seems to be conceded that the record does not show that the first grand jury which found the first indictment was empaneled and sworn as the law directs. This court has held that where the record fails to show the jury was duly summoned, empaneled and sworn the indictment may be quashed on motion. *Yates* v. *People*, 38 Ill. 527; *Williams* v. *People*, 54 id. 422; *Sullivan* v. *People*, 156 id. 94; *People* v.. *Gray*, 261 id. 140.

It is contended by counsel for plaintiff in error that under the above authorities, and under a proper construction of the provisions of the Criminal Code heretofore referred to, an indictment which is thereafter quashed, in order to be effective to toll the statute, must be a valid indictment and not one that is void. Statutes of limitations are measures of public policy, only. They are entirely subject to the will of the legislature, and may be changed or repealed altogether in any case where a right to acquittal has not been absolutely acquired by the completion of the period of limitation. Such a statute is an act of grace in criminal prosecutions. The State makes no contract with criminals at the time of the passage of acts of limitations that they shall have immunity from punishment if not prosecuted within the statutory period. (17 R. C. L. 704.) Said section 6 of division 4 of the Criminal Code does not state that when a "valid" indictment is quashed it will be a bar to a new indictment for the same offense, but simply states "when an indictment is quashed," etc., without any adjective or modifying word as to the kind of an indictment. It is clear, as a matter of public policy, that the Statute of Limitations in criminal cases is enacted for the purpose of allowing the accused to defend himself while the charge is new and the evidence as to actual facts can be more readily obtained than if there had been a long delay in bringing the charge. It is also manifest that the provision that the limitation statute will not run against the charge if an indict-

ment is quashed is put upon the same basis, for if the indictment is originally brought within the time, the accused has knowledge of the charge and can look up his evidence and be prepared to defend himself against the accusation. The Statute of Limitations is not grounded upon mere delay in the prosecution but rather upon delay in commencing the prosecution, and the running of the statute is also suspended if the accused is absent from the State to avoid prosecution. There is no case in this State that is decisive of the question. In *Swalley* v. *People,* 116 Ill. 247, the court said (p. 250) : "Whether the time during which the first indictment was pending is not to be reckoned depends upon whether the proceedings on the first indictment were 'set aside,' within the meaning of the section above cited. The section names three modes of disposition of the indictment : quashing it, reversal of the proceedings thereon on error, and setting aside the proceedings on it. The first two are specific modes, the last is general. To 'set aside' is very broad in scope,—'to defeat the effect or operation of;' and we think it may well be held to embrace here every other mode of defeat of the proceedings on an indictment than quashing it and reversal on error, and so, that the manner of disposal of the first indictment amounted to a setting aside of the proceedings under it and came within the saving clause of the section." In this last case an order was entered which *nolle prossed* the former indictment. The reasoning of the opinion above quoted shows that the court intended to construe the statute herein questioned as applying to all proceedings in which a former indictment was for any reason set aside. There is no suggestion in the reasoning as to whether it must be a valid indictment or not. Indeed, from the reasoning it would seem that if it was set aside or quashed for any reason the statute would be tolled. If an indictment is valid, how can it be legally quashed?

In *State* v. *Hansbrough,* 181 Mo. 348, an indictment charging bigamy was *nolle prossed* by the prosecuting at-

torney. That indictment stated that the alleged bigamous marriage occurred in a county to the grand jurors unknown, and as that court had held that an indictment for a bigamous marriage could only be prosecuted in the county where the marriage occurred, no conviction could be had under the first indictment, because the court would be without jurisdiction. The court there said, in construing a statute very similar to the one here under consideration (p. 352) : "It does not restrict its operation to any particular cause or causes for which the indictment may be quashed, set aside or reversed, and must therefore include any and all grounds which may be held by the court to be sufficient grounds for quashing the indictment." See, also, as bearing on this question, *State* v. *Child,* 44 Kan. 420; *Stafford* v. *State,* 59 Ark. 413; 12 Cyc. 254; 19 Am. & Eng. Ency. of Law, 163, 165, and cases cited.

There can be no question that the offense charged in this last indictment and the offense charged in the former indictment which was quashed are one and the same offense. The statute here under consideration should receive a reasonable construction. We do not think it reasonable to construe section 6 of division 4 of the Criminal Code as if it read, "when a *valid* indictment is quashed," inserting the word "valid" before "indictment." On the ground of public policy we do not see any reason why, under the circumstances of this case, the Statute of Limitations should be considered as having run, the evidence clearly showing that the accused knew all about the warrant being issued shortly after the offense was committed and undoubtedly knew about the original indictment, and was in no way misled to his injury in the trial by the fact that the original indictment was not valid. When any indictment, valid or invalid, is quashed, or the proceedings thereunder are set aside or reversed by writ of error, we think the Statute of Limitations does not run during the pendency of such indictment, and therefore the trial court did not err in en-

tering judgment on this verdict or in giving the instructions as to the running of the Statute of Limitations which are objected to as misleading the jury.

It is objected by counsel for plaintiff in error that the testimony as to the buggy and horse-tracks in the woods by Clevenger and others was improperly admitted. Whatever testimony tends directly to show the defendant guilty of the crime charged is competent. The test of admissibility is the connection of the facts proved with the offense charged. (*People* v. *Jennings,* 252 Ill. 534, and cases cited.) Under the reasoning of this court under somewhat similar conditions in *People* v. *Pfanschmidt,* 262 Ill. 411, we think the testimony as to these tracks, their measurements, etc., was admissible.

The objection is also made by counsel that the trial court erred in permitting plaintiff in error to be cross-examined as to certain things to which it is claimed no reference was made in his direct examination. We think the subject matter that was referred to in the questions asked of him on cross-examination had been referred to in the examination of plaintiff in error in chief. We do not find any error in this regard. See Jones on Evidence, secs. 820-825; *People* v. *Strauch,* 247 Ill. 220.

Counsel for plaintiff in error further insist that the trial court erred in giving the fifteenth instruction for the People. This instruction, in the language of the statute, told the jury that any female under the age of sixteen years shall be incapable of consenting to the act of intercourse, and that anyone over seventeen years having sexual intercourse with a girl under sixteen years would be guilty of rape whether he had obtained the consent of the girl or not, and then concluded: "In the present case neither the element of force nor the question of consent has any application. The prosecutrix could not consent, and the law resists for her." It is insisted that this instruction should not have been given because it invades the province of the jury and

assumes that the prosecutrix was under the age of sixteen years and that the plaintiff in error was over seventeen years. We think the instruction in this form should not have been given, but we cannot see how it is possible that the jury was in any way misled by it. No one disputed the fact that the prosecuting witness was under sixteen years of age. Four witnesses testified that she was between fourteen and fifteen years at the time of the crime, and that fact was also proved from the family records. Several witnesses testified that plaintiff in error was over the age of seventeen years, and he testified on the stand that he was thirty-eight years of age at the time of the hearing in March, 1917. Therefore, according to his own testimony, he would have been thirty-two years of age at the time the crime was committed. There was no conflict of any kind in the evidence as to the age of the prosecuting witness or that of plaintiff in error, and therefore the giving of this instruction was harmless error. See *People* v. *Probst,* 237 Ill. 390.

It is further contended by counsel for plaintiff in error that the arguments of one of the attorneys for the State were very inflammatory and prejudiced the plaintiff in error before the jury. The remarks of the assistant prosecutor are set out in full in the abstract. In that part objected to, apparently the assistant prosecutor commented on the enormity of this crime as being committed by a man who was a preacher of the gospel. We think the comments were justified in view of the uncontradicted evidence in the record as to the nature and character of the offense.

It is further insisted by counsel for plaintiff in error that the judgment of the court in sentencing the plaintiff in error to the "penitentiary at Chester, Illinois," is erroneous, it being insisted that there is no penal institution at such place in this State. This criticism of the form of the judgment is without merit. Paragraph 75 of chapter 108 (Hurd's Stat. 1916, p. 1975,) refers to the Southern Illi-

nois penitentiary at Chester. The order granting plaintiff
in error a *supersedeas* and permitting him to remain out on
bail pending the decision of this court on the case was di-
rected to "the penitentiary at Chester, Illinois." It is mani-
fest that public officials understand that there is a peniten-
tiary at Chester.

We find no reversible error in the record, and the judg-
ment of the circuit court will be affirmed.

*Judgment affirmed.*