## FALTER et al. v. UNITED STATES.

Circuit Court of Appeals, Second Circuit.
January 9, 1928.

No. 107.

**1. Conspiracy ⊜48—Instruction that it was fraud to defeat government's right to fully contract, or to deprive it of its dominion as owner, held not error (Cr. Code, § 37 [18 USCA § 88]).**

In prosecution, under Criminal Code, § 37 (18 USCA § 88), for conspiracy to defraud United States by falsely representing to the Textile Branch of the Surplus Property Division of the War Department that contracts for sale of surplus goods had not been filled, and that alleged buyer was therefore entitled to receive newly disposable goods as they came in at the prices in original contract, resulting in defendants acquiring large amounts of textiles at prices lower than the branch would have sold them, but for the fraud, instruction that it was a fraud to defeat the right of the United States "to fully contract," or to deprive it of "its dominion as an owner" and "its freedom to contract as such," held not error.

**2. Conspiracy ⊜45—That government was not legally bound to fill contracts held immaterial on issue of fraud in inducing government officer to make substituted contracts.**

That United States had not bound itself by any legal obligations to fill any of the contracts made by its officers in the Surplus Property Division of the War Department for sale of surplus goods held immaterial, on issue of defendants' fraud in obtaining delivery of large quantities of textiles at prices lower than they could have purchased them by falsely representing that they were morally entitled to receive the goods under a previous contract which had not been filled.

**3. Conspiracy ⊜33(1)—Statute making it crime to conspire to defraud United States is at least as coextensive as conspiracy at common law (Cr. Code, § 37 [18 USCA § 88]).**

Criminal Code, § 37 (18 USCA § 88), making it a crime to conspire to defraud the United States in any manner, is at least as coextensive as a conspiracy at common law and covers much more.

**4. Fraud ⌖22(I)—False representations to government officer as to existence of contracts held actionable, though he had available evidence of falsity.**

False representations to government officer that a certain corporation had unfilled contracts with government for purchase of surplus property from Surplus Property Division of the War Department, which induced government officer to grant abatement of price, would give government a civil action for deceit, notwithstanding government officer had available evidence of the falsity of such statements.

**5. Fraud ⌖23—That victim could have discovered cheat is immaterial, when parties do not have equal means of knowledge.**

When the parties do not have equal means of knowledge, it is immaterial that the victim of false representations, if more suspicious, could have discovered the cheat, and cause of action for deceit was not thereby defeated.

**6. Conspiracy ⌖38—That government officer, induced to contract for disposal of surplus goods by false representations, had available evidence of fraud held no defense in prosecution for conspiracy to defraud (Cr. Code, § 37 [18 USCA § 88]).**

In prosecution under Criminal Code, § 37 (18 USCA § 88), for conspiracy to defraud United States by falsely representing to the Textile Branch of the Surplus Property Division of the War Department that contracts for sale of surplus goods had not been filled, and that alleged buyer was therefore entitled to receive newly disposable goods as they came in at the prices in original contract, resulting in defendants acquiring large amounts of textiles at prices lower than the branch would have sold them, but for the fraud, it was no defense that officer deceived had available the records of falsity of defendants' representations, where documents in his office were extremely voluminous and confused, and one of defendants had just been in entire charge of the Textile Branch, and knew what records showed far better than the officer deceived.

**7. Conspiracy ⌖47—Conviction for conspiracy to defraud government by false representations that corporation was entitled to receive surplus goods under contract held sustained by evidence (Cr. Code, § 37 [18 USCA § 88]).**

In prosecution, under Criminal Code, § 37 (18 USCA § 88), for conspiracy to defraud United States by falsely representing to the Textile Branch of the Surplus Property Division of the War Department that contracts for sale of surplus goods had not been filled, and that alleged buyer was therefore entitled to receive newly disposable goods as they came in at the prices in original contract, verdict of guilty *held* sustained by evidence.

**8. Criminal law ⌖1169(5)—Witness' answer on cross-examination that indictment against him had been dismissed and new one substituted held not prejudicial, where answer was stricken and jury told to disregard.**

Where witness for defendants on cross-examination volunteered statement that he had been indicted with defendants, subsequent question whether said indictment had been dismissed and another substituted therefor, answered in affirmative, *held* not prejudicial to defendants, where court struck the answer out and instructed jury to disregard it.

**9. Conspiracy ⌖45—In prosecution for conspiracy to defraud government, evidence as to market prices of goods sold by government officer held competent to prove minimum price at which officer could sell (Cr. Code, § 37 [18 USCA § 88]).**

Where government officer in charge of branch of Surplus Property Division of the War Department had authority to sell surplus goods at prices not less than the market prices of same or similar goods, evidence as to market prices of the same or similar goods in the form of graphs from a trade paper and expert testimony was competent and admissible to prove minimum prices at which officer might sell, in prosecution under Criminal Code, § 37 (18 USCA § 88), for conspiracy to defraud United States by false representations that certain corporation was entitled to receive newly disposable goods at prices in certain contract which was in fact nonexistent.

**10. Criminal law ⌖406(4)—Indictment is not "pleading of the United States," and as such admissible against it in subsequent prosecution.**

An indictment is not a "pleading of the United States," and as such admissible against it in a subsequent prosecution, even if a pleading of the United States is admissible against it, but is charge of grand jury, which is neither an officer nor agent of the United States, but part of the court.

**11. Jury ⌖83(3)—Reserve officer in federal military service held not disqualified as juror in prosecution for conspiracy to defraud government (Cr. Code, § 37 [18 USCA § 88]).**

Reserve officer in the military service of the United States, though subject to call, and in such case entitled to receive pay, was not incompetent as juror in prosecution, under Criminal Code, § 37 (18 USCA § 88), for conspiracy to defraud the United States.

**12. Constitutional law ⌖199—Proviso increasing limitation as to offenses involving defrauding United States held not within prohibition against ex post facto legislation as respects crime previously committed, but against which limitation had not expired (18 USCA § 582).**

Proviso added to Rev. St. § 1044, in November, 1921 (18 USCA § 582), by which the three-year limitation period was extended to six years as respects offenses involving the defrauding or attempting to defraud the United States, was not within the constitutional prohibition against ex post facto legislation as respects a crime committed before its enactment, but against which the three-year limitation period had not expired.

**13. Criminal law ⌖147—Six-year limitation held applicable to conspiracy to defraud United States (18 USCA § 582; Cr. Code, § 37 [18 USCA § 88]).**

Six-year limitation proviso, added to Rev. St. § 1044, by Act Nov. 17, 1921 (18 USCA § 582), in respect to offenses involving defraud-

ing or attempts to defraud the United States, was applicable to the crime of conspiracy to defraud the United States, in violation of Criminal Code, § 37 (18 USCA § 88), where such crime consisted only in the fraudulent conspiracy.

**14. Jury ⛛⟶131(10)—Judge's examination of prospective jurors, and refusal to allow counsel to examine them directly, held not error.**

Action of District Judge, in examining prospective jurors himself and not allowing counsel to question them directly, though accepting from them any reasonable suggestions adopted in accordance with the practice recommended by the judicial conference and incorporated into the rules of the District Court, *held* not error, in view of Rev. St. § 819 (28 USCA § 424 [Comp. St. § 1264]), since such practice fulfills the requirements of the law so long as the power is exercised with reasonable regard for rights of accused.

**15. Criminal law ⛛⟶433—Refusal to read letters to jury held within trial court's discretion.**

Trial court's refusal to read certain letters to the jury just as the jury retired *held* not error, such matter being within court's discretion.

In Error to the District Court of the United States for the Southern District of New York.

Benjamin F. Falter, Herman H. Canter and Bertrand Weiss were convicted of a conspiracy to defraud the United States, and they bring error. Affirmed.

The defendants were jointly indicted for a conspiracy to defraud the United States under section 37 of the Criminal Code (18 USCA § 88). The indictment charged that in the autumn of the year 1919, one Gottesman did business in New York under the name "Universal Trading Company," and had made large purchases of textile goods from the Surplus Property Division of the War Department. At this time Falter was chief of the Textile Branch of the division and Weiss and Canter were employees of Gottesman. It had been the practice of the branch, when contracts already made could not be filled, to fill them later as surplus goods became disposable, although the United States was under no obligation so to do. Moreover, if, as was the case at the time in question, prices were rising, it was the further practice to sell to the disappointed buyer the newly disposable goods, or such substitutes as were most nearly the same, at prices equal to those at which the original contracts had been made.

The fraud laid consisted of Falter's combining with Canter and Weiss to represent to the Textile Branch that contracts of the Universal Trading Company had not been filled, and that it was therefore entitled, under the practice before mentioned, to receive newly disposable goods as they came in at the prices of the original contracts. Their statements were false, and resulted in their acquiring large amounts of textiles at prices lower than the branch would have sold them, but for the fraud. Further to accomplish these ends the defendants organized a company, called the "Universal Sales Company," to which they falsely represented that Gottesman had transferred the contracts of the Universal Trading Company. Thus it became possible for them to get the advantage of their fraudulent statements that the Universal Trading Company had unfilled contracts which were entitled to some preference.

The facts, as the jury might have found them from the evidence, were that Falter had been for some time before the month of November, 1919, the head of the Textile Branch, in charge of the sale of surplus war materials falling under that class, and was well acquainted with its work, its records, and its practices. Canter and Weiss were Gottesman's employees, in charge of buying such material for him from the United States. In September of that year they had procured a number of contracts from the Textile Branch, calling for the delivery of large quantities of material. Some of these had been filled, and on November 21st Falter, while still the head of the branch, assisted Canter and Weiss in preparing a letter which purported to set forth a record of the quantities still undelivered and due Gottesman. The correctness of this letter was one issue in the case.

Falter left the service about December 1st, and one Cole succeeded him, a man unfamiliar at the outset with the practices of the branch. About the middle of December Falter, acting in conjunction with Canter and Weiss, reappeared, and gave Cole a list of the contracts which, as he assured him, were still open and unfulfilled in favor of the Universal Trading Company. Upon this list, which represented far more than on any theory could have been due, Cole, without checking the records, accepted very large orders for the Universal Trading Company at September prices.

Meanwhile all prices had been rising, and the prices fixed by Cole upon the substituted contracts were much lower than he was authorized to use upon original sales at that time. The practice of the branch was to establish as a minimum price, below which no goods could be sold by original contract, a

certain percentage of the going market prices, as determined by the head of the branch from such sources as seemed to him reliable. He had no authority to go below these, and in the case of the sales made by Cole after Falter left he would not have gone below them, except for Falter's assurances that they were substitutions for earlier contracts at lower prices.

Gottesman went to Europe about the middle of January, 1920, leaving his brother in general charge of his business. Canter and Weiss asserted that before leaving he had assigned to them his interest in the purchases of surplus textiles, and that they had a letter to that effect, which they had shown the branch, and on which they procured deliveries upon the substituted contracts. This was, however, disputed by the prosecution through Gottesman's brother, whose testimony permitted another conclusion. In any case, Canter and Weiss formed a company by the name of Universal Sales Company, by means of which, as assignees of Gottesman, they procured deliveries of immense quantities of textiles during the early part of the year 1920.

Falter was shown to have been concerned in business with them; he was traced repeatedly to their company in Washington at a time when negotiations were going on with the branch. He was also shown to have received some $10,000 as commissions on the sales of goods emanating from them. This evidence need not be stated in detail.

Upon these writs many points are raised, which are discussed in the opinion and need not be set forth here.

Davies, Auerbach & Cornell, of New York City (Martin A. Schenck, Frederic C. Scofield, and Emily C. Holt, all of New York City, of counsel), for plaintiffs in error Canter and Weiss.

Bandler, Haas & Collins, of New York City (Nash Rockwood, Harry S. Bandler, and John F. Collins, all of New York City, of counsel), for plaintiff in error Falter.

Edwin G. Davis, of Washington, D. C., for the United States.

Before MANTON, L. HAND, and SWAN, Circuit Judges.

L. HAND, Circuit Judge (after stating the facts as above). [1, 2] The question going to the heart of the case is whether a fraud was proved within the statute, especially in the light of what the judge said to the jury. The defendants argue that it was error to in-struct them that it was a fraud to defeat the right of the United States "to fully contract," or to deprive it of "its dominion as an owner" and "its freedom to contract as such." Some of these quotations are not in the judge's instructions, but only in his description of the indictment, but that we pass. As we view it, these locutions under the circumstances properly enough described the substance of an offense punishable under section 37. The United States had not, we shall assume, bound itself by legal obligation to fill any of the contracts made by its officers in the Surplus Property Division of the War Department. In appealing to those officers for favor, because Gottesman had not got the deliveries due him, Canter and Weiss were not, therefore, standing upon any right, but appealing to the compunctions of the United States for its failure to perform its moral obligations. We confess to an entire failure to understand how this can be material on the issue of fraud. Behind it seems to lie the notion that a man may not be defrauded out of what he knows he is under no legal obligation to give. If in fact Cole was induced to make the substituted contracts by Falter's deceit, it makes not the slightest difference that he was not bound to recognize the claims at all. A man may defraud me by saying that he has rescued my son from death, as well as by saying that he has furnished him with board and lodging.

[3] In the case at bar it is not necessary to extend section 37 beyond the criminal liability recognized at common law. A conspiracy to perpetrate a civil fraud was a crime, though the fraud itself was not one. In the early eighteenth century frauds in general were probably still crimes, even when not of a public character, and not within the statute of false tokens (33 Hen. VIII, c. 1), Reg. v. Mackarty, 2 Ld. Raym. 1179; though the question was not settled, Reg. v. Jones, 1 Salk. 379. Afterwards the doctrine was narrowed, and only frauds of a public nature remained criminal, Rex v. Wheatley, 2 Burr. 1127; yet a conspiracy to defraud still retained its early criminal character, Rex v. Warburton, L. R. 1 C. C. 274; Rex v. Kenrick, 5 Q. B. 49. While there are no crimes against the United States, except by statute, any fraud upon the United States is of a public character, and would at common law have itself been a crime, and quite independently of that a conspiracy to defraud the United States would also have been criminal. The section is at least coextensive with a conspiracy at common law, and indeed covers much more. Haas v. Henkel, 216 U. S.

462, 30 S. Ct. 249, 54 L. Ed. 569, 17 Ann. Cas. 1112; U. S. v. Foster, 233 U. S. 515, 34 S. Ct. 666, 58 L. Ed. 1074; U. S. v. Barnow, 239 U. S. 74, 36 S. Ct. 19, 60 L. Ed. 155; though it continues to demand some element of dishonesty, some cheat or false dealing, Hammerschmidt v. U. S., 265 U. S. 182, 44 S. Ct. 511, 68 L. Ed. 968; Fasulo v. U. S., 272 U. S. 620, 47 S. Ct. 200, 71 L. Ed. 443.

[4, 5] Now a civil action of deceit would have been lain under the circumstances at bar. When Falter told Cole that Gottesman 'has unfilled orders, and thus procured from him an abatement of price, it was a common-law deceit. His false utterance concerned existing facts; i. e., that the orders had been issued, and that the quantities they prescribed had not been delivered. This did not involve any statement as to the validity of the orders in law; Cole did not so understand it, and Falter knew that he did not. Nor did it matter that Cole had available the evidence of their untruth. Such considerations ordinarily concern only the plaintiff's reliance upon the representations. Andrus v. St. Louis, etc., Co., 130 U. S. 643, 9 S. Ct. 645, 32 L. Ed. 1054; Slaughter v. Gerson, 13 Wall. 379, 20 L. Ed. 627; Farnsworth v. Duffner, 142 U. S. 43, 12 S. Ct. 164, 35 L. Ed. 931. Those cases do, indeed, contain general statements that, if the plaintiff has the means at hand by which he can check the fraud, he may not complain; but these are to be read in the light of the facts. When the parties do not have equal means of knowledge, it is immaterial that the victim, if more suspicious, could have discovered the cheat, Smith v. Richards, 13 Pet. 26, 10 L. Ed. 42; Tooker v. Alston, 159 F. 599, 16 L. R. A. (N. S.) 818 (C. C. A. 8); Martin v. Burford, 181 F. 922 (C. C. A. 9); Vulcan Metals Co. v. Simmons Mfg. Co., 248 F. 853 (C. C. A. 2).

[6] It is perhaps doubtful whether the point has any relevancy whatever to a conspiracy to defraud, except as it may bear upon intent; that is, whether the accused could have intended his victim in fact to rely upon the deceit. Assuming, however, that it is relevant, it is clear that the defendants here do not fall within the exception. Falter had just been in entire charge of the Textile Branch; he knew what had been done, and what were the records, far better than could Cole, who had just been substituted for him. The documents were extremely voluminous and confused; an inquiry into the facts was, as the trial proved, troublesome, and would be very laborious. It was natural, though perhaps not excusable, for Cole to rely on Falter's superior knowledge. This Falter knew and relied upon in practicing upon his credulity and possibly upon his indolence. To say that the defendants are to be excused because of the success of their contrivances would be to sanction the very consummation of their crime.

[7] There was ample evidence proving the representations and their falsity. Cole's testimony alone suffices, and must be ignored, if the point is to have even a colorable validity. That he contradicted his evidence, given on other occasions, is quite true; but the jury was to decide at which time he told the truth. Even if it were not enough, standing alone, the evidence as a whole is so sinister in its implications as to give inherent credibility to what he said. Moreover, the prosecution might have relied alone upon the letter of November 21st. It is quite true that its falsity was involved in a maze of documentary evidence, which it is extremely difficult to unravel. But there was at least some evidence to support the verdict, even as to it. For example, the first item of 207,000 yards of gray sheeting seems at one time to have been canceled. The next of 471,000 yards of gray jeans Falter himself reduced to 283,000 on November 6th, and could give no convincing explanation for its later appearance at the original amount. No sale could be found before November 21st of 738,000 yards of "Osnaberg gray." Exhibit D–14, relied upon by the defendants, is not an accepted bid, and Purcell's evidence, that the letter which answered it was the equivalent of an acceptance, the jury was free to disregard, in view of his relation to the case.

In any event the defendants received large quantities of goods in excess of the amounts left undelivered, even if the letter be taken at its face, and these at lower prices than those current when the sales were made. Thus, nearly 1,000,000 yards of gray sheeting were procured, over 1,300,000 yards of gray duck, 200,000 yards of bleached jeans, and 80,000 yards of "Osnaberg gray, 30 pounds 7 ounces." An effort is made to account for these by adding those contracts made in December with the Universal Trading Company, but it is precisely these which the prosecution challenged as substitutions for original contracts never in fact made. The similarity in price between these December contracts and those made in September and November was some evidence of the truth of this contention. It is not necessary

to hold that the case was demonstrated, but to say that there was no evidence which justified the verdict would be wholly unwarranted.

[8] The main outline of the case being so disposed of, we take up the supposed errors occurring in the progress of the trial. Purcell, a witness called by the defense, on his cross-examination volunteered the statement that he had been indicted with the defendants. The prosecution inquired when he was indicted, and with whom, to which no objection was made. Then it inquired whether that indictment had not been dismissed, and another found, to which the witness assented. The court struck out the answer, and told the jury to disregard it. We cannot see how it could have prejudiced the jury, after the finding of the first indictment appeared, to learn that another had been substituted. In any case, the judge cured the matter by what he said. As to Falter it was doubly cured by his counsel's consent to the evidence, if the indictment were read, which was done.

[9] Evidence was allowed of the market value of the goods when they were sold; this in the form of testimony by experts and of graphs from a trade paper. The objection was that the goods sold were of different kinds in some instances, and always were classed as secondhand. The purpose of this evidence was, not to prove the value of the goods, but the minimum prices at which Cole might sell. For this it was competent, since in accordance with his instructions he used in his calculations the market prices of goods presently sold or of those closely alike. It was relevant, because the prices so calculated were higher than he accepted, and he could not, under his orders, have accepted them, unless he believed that they were in substitution for earlier orders. The supposed error arises from a misunderstanding of the use made of the evidence.

[10] The court refused to allow as an admission an allegation in a prior indictment contrary to that made on the trial. The notion was that an indictment is a pleading of the United States, and as such admissible against it. But an indictment is not a pleading of the United States, but the charge of a grand jury, and a grand jury is neither an officer nor an agent of the United States, but a part of the court. The United States neither selects nor controls it, nor has anything to do with it, but to present to it its evidence. True, the district attorney draws up the indictment, but at the grand jury's instructions, and the jury present it. Whatever be the degradation of that ancient institution in practice, it still remains in law more than the dummy of the prosecution. And so the point is bad, even without considering whether an indictment, if it were a pleading of the United States, would be competent as an admission.

[11] One of the jurors was a reserve officer in the military service of the United States, and his disqualification was urged under Crawford v. U. S., 212 U. S. 183, 29 S. Ct. 260, 53 L. Ed. 465, 15 Ann. Cas. 392. The case is plainly distinguishable, for the juror was there receiving regular pay as a clerk in a subpostal station. A reserve officer will, it is true, if called, receive pay, and he is subject to call; but then so is every male citizen of the United States between the ages of 18 and 45. It would be preposterous to say that all these are incompetent as jurors in criminal causes. Their interest is remote and insubstantial.

[12] The crime was committed in 1919 and 1920, at a time when the period of the statute of limitations was three years. R. S. § 1044 (Comp. St. § 1708). In November, 1921, the proviso was added by which the period was extended to six years in the case of "offenses involving the defrauding or attempts to defraud the United States or any agency thereof, whether by conspiracy or not." 18 USCA § 582. The application of the proviso to the case at bar being clear from its last sentence, the defendants argue that the amendment is ex post facto legislation. Perhaps they would be right, if the earlier statute had once run in their favor. Moore v. State, 43 N. J. Law, 203, 39 Am. Rep. 558. But the period had not run, and the argument is, and must be, that any change after the commission of the crime, and while the time is running, is within the constitutional prohibition. It is a little curious that the only case we can discover is Com. v. Duffy, 96 Pa. 506, 42 Am. Rep. 554, though there are dicta in accord in People v. Buckner, 281 Ill. 340, 117 N. E. 1023, 3 A. L. R. 1323; and in Moore v. State, supra.

In Mallett v. North Carolina, 181 U. S. 589, 21 S. Ct. 730, 45 L. Ed. 1015, it was held that the allowance of an appeal to the prosecution was constitutional, and Beazell v. Ohio, 269 U. S. 167, 46 S. Ct. 68, 70 L. Ed. 216, laid it down generally that the question was one of degree and depended upon whether the result was "harsh and oppressive." Certainly it is one thing to revive a prosecution already dead, and another to give it a longer lease of life. The ques-

tion turns upon how much violence is done to our instinctive feelings of justice and fair play. For the state to assure a man that he has become safe from its pursuit, and thereafter to withdraw its assurance, seems to most of us unfair and dishonest. But, while the chase is on, it does not shock us to have it extended beyond the time first set, or, if it does, the stake forgives it.

[13] That the proviso applied to the case at bar admits of no question. Weinhandler v. U. S., 20 F.(2d) 359 (C. C. A. 2), was far stronger for the defense. The fraud was neither an incident nor the purpose of the crime, as in U. S. v. Noveck, 271 U. S. 201, 46 S. Ct. 476, 70 L. Ed. 904, nor an offense against the revenue laws, as in U. S. v. McElvain, 272 U. S. 633, 47 S. Ct. 219, 71 L. Ed. 451. The conspiracy to defraud was the crime, and the crime consisted only in the fraudulent conspiracy.

[14] The judge adopted the practice, recommended by the Judicial Conference and incorporated into the rules of the District Court for the Southern District of New York, of examining the jury himself, not allowing counsel to put questions to them directly, though accepting from them any reasonable suggestions. This is assigned as an error, and is often so assigned in criminal causes. In Pointer v. U. S., 151 U. S. 396, 407, 408, 14 S. Ct. 410, 38 L. Ed. 208; and St. Clair v. U. S., 154 U. S. 134, 147, 148, 14 S. Ct. 1002, 38 L. Ed. 936, it was held that the designation and impaneling of jurors is within the control of United States courts by rules, subject to such settled principles of the criminal law as are essential to securing impartial juries. By Revised Statutes, § 819 (28 USCA § 424; Comp. St. § 1264), the court is to try all challenges to the favor, and, while it was the custom at common law to allow the parties to cross-examine, there is nothing in this essential to securing a panel free from bias. The length and particularity of the examination of jurors had become a scandal, and required some effective control. So long as the power is exercised with reasonable regard for the rights of the accused, it fulfills the requirements of the law.

[15] The other assignments of error do not justify lengthy discussion, in view of what has been said already. The exceptions at the very close of the case, just as the jury retired, concerned the court's refusal to read certain letters to the jury, and to an erroneous statement of the prosecution's contention. It is impossible to see how the defendants could be prejudiced by the second, and

the first lay in discretion. The objection to the introduction of the copy of Gottesman's letter to Canter and Weiss did not raise the adequacy of the search for the original. The charge respecting the putative assignment was correct, and the mention of the limitation upon assignments printed on the government contracts was at worst harmless error.

The defendant's guilt was amply proved, the lengthy trial was fairly conducted, and there is no reason why the judgment should not stand.

Judgment affirmed.