## MILLER v. UNITED STATES.

Circuit Court of Appeals, Second Circuit.
February 6, 1928.

No. 144.

1. Conspiracy ☞48—Evidence of conspiracy to defraud United States by allowance of claims respecting property seized by Alien Property Custodian without proper investigation held sufficient to go to jury (Trading with the Enemy Act, § 9 [Comp. St. § 3115½e]; Cr. Code, § 37 [18 USCA § 88]).

Evidence supporting indictment, under Criminal Code, § 37 (18 USCA § 88), for conspiracy to defraud the United States concerning its right to have the determination of claims under Trading with the Enemy Act, § 9 (Comp. St. § 3115½e), by its Alien Property Custodian and Attorney General, conducted honestly in its behalf and free from partiality and bias because of their personal and pecuniary interest, held sufficient to require submission to jury.

2. Criminal law ☞1159(2)—Jury verdict in criminal case, supported by sufficient evidence, is conclusive on appellate court.

Verdict of jury in criminal case, supported by sufficient evidence, is conclusive on appellate court.

3. Conspiracy ☞33(2)—Indictment against Alien Property Custodian for conspiring to allow illegal claims held to state crime; "conspiracy to defraud United States" (Trading with the Enemy Act, § 9 [Comp. St. § 3115½e]; Cr. Code, § 37 [18 USCA § 88]).

Indictment charging that defendants, as Alien Property Custodian and as Attorney General, conspired to defraud United States concerning its governmental functions, and particularly its right to honest determination of claims under Trading with the Enemy Act, § 9, without partiality or bias because of their personal and pecuniary interest in having claims allowed, held to state a crime of "conspiracy to defraud United States," within Criminal Code, § 37 (18 USCA § 88), though defendants who were to make the decision were not defrauded.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Conspiracy.]

24 F.(2d)—23

4. Criminal law ☞147—Six-year statute of limitations held applicable to successful conspiracy to defraud United States by allowance of claims without proper investigation; "involving defrauding of United States, whether by conspiracy or not" (Rev. St. § 1044, as amended by Act Nov. 17, 1921 [18 USCA § 582]).

Successful conspiracy to defraud United States of its governmental rights or property by allowing illegal or suspicious claims without proper investigation for a pecuniary reward is an offense "involving the defrauding of the United States, whether by conspiracy or not," within Rev. St. § 1044, as amended by Act Nov. 17, 1921 (18 USCA § 582), providing for a six-year period of limitations in such cases.

5. Conspiracy ☞48—Whether acts occurring after allowance of claims constituted overt acts, in conspiracy to defraud United States by allowance and payment of claims, held for jury (Cr. Code, § 37 [18 USCA § 88]; Trading with the Enemy Act, § 9 [Comp. St. § 3115½e]).

In prosecution, under Criminal Code, § 37 (18 USCA § 88), for conspiracy to defraud United States by allowance and payment of illegal or suspicious claim under Trading with the Enemy Act, § 9 [Comp. St. § 3115½e], by Alien Property Custodian and Attorney General, without proper investigation, and for pecuniary reward, whether acts relating to payment of claim by government were overt acts to effect object of conspiracy held jury questions, as against contention that conspiracy was consummated when claim was allowed, and that events occurring thereafter could not be overt acts in conspiracy.

6. Conspiracy ☞48—Disagreement of jury as to guilt of one alleged conspirator to defraud United States held not to preclude conviction of the other (Cr. Code, § 37 [18 USCA § 88]; Trading with the Enemy Act, § 9 [Comp. St. § 3115½e]).

In prosecution, under Criminal Code, § 37 (18 USCA, § 88), for conspiracy to defraud United States by allowance and payment of illegal or suspicious claims, under Trading with the Enemy Act, § 9 (Comp. St. § 3115½e), by Alien Property Custodian and Attorney General, without proper investigation and for pecuniary reward, fact that jury disagreed as to guilt of Attorney General held not, as matter of law, to preclude conviction of Custodian.

7. Criminal law ☞1172(7)—Alien Property Custodian, charged with conspiring to defraud government, could not complain of instruction that he was charged with information in office papers not known to him (Cr. Code, § 37 [18 USCA § 88]; Trading with the Enemy Act, § 9 [Comp. St. § 3115½e]).

In prosecution under Criminal Code, § 37 (18 USCA § 88), against Alien Property Custodian for conspiracy to defraud United States by allowance and payment of claims under Trading with the Enemy Act, § 9 (Comp. St. § 3115½e), without proper investigation and for pecuniary reward, instruction that defendant could not be charged with information in papers in his office if he did not personally know of their presence and contents, even

though he thereafter received reward for having done his duty, *held,* not one of which defendant could complain, since, if he intended to aid conspiracy and intentionally omitted to investigate, he could be held to knowledge that there were on hand documents from which he could have learned facts.

**8. Criminal law ⬤⟿423(1)—Acts and declarations of conspirator while carrying on were admissible against other.**

Acts and declarations of one alleged conspirator while conspiracy was being carried on were admissible against the other.

**9. Criminal law ⬤⟿423(3)—Telegrams between Alien Property Custodian and his secretary relating to claim alleged to have been improperly allowed in carrying out conspiracy to defraud United States held admissible in evidence (Cr. Code, § 37 [18 USCA § 88]; Trading with the Enemy Act, § 9 [Comp. St. § 3115½e]).**

In prosecution against Alien Property Custodian, under Criminal Code, § 37 (18 USCA § 88), for conspiracy to defraud United States by allowance and payment of illegal or suspicious claims under Trading with the Enemy Act, § 9 (Comp. St. § 3115½e), without proper investigation and for pecuniary reward, telegrams passing between defendant and his secretary relating to claim involved *held* admissible in evidence, as going to establish defendant's exceptional and significant personal interest in the passage of the claim and speed with which it was accomplished.

In Error to the District Court of the United States for the Southern District of New York.

Thomas W. Miller was convicted of a conspiracy to defraud the United States, in violation of Criminal Code, § 37, and he brings error. Affirmed.

George Winship Taylor, of New York City (Samuel Seabury and Robert S. Johnstone, both of New York City, of counsel), for plaintiff in error.

Charles H. Tuttle, U. S. Atty., of New York City (David W. Peck, of New York City, of counsel), for the United States.

Before MANTON, SWAN, and AUGUSTUS N. HAND, Circuit Judges.

MANTON, Circuit Judge. The plaintiff in error and another were tried jointly for a conspiracy alleged to have existed between January 1 and December 31, 1921, wherein and whereby they conspired with others named in the indictment "to defraud the United States, of and concerning its governmental functions and rights hereinafter described, to wit, of and concerning its function of administering said properties and trusts above described as the same should properly have been administered according to law; of and concerning its function of ad-ministering the Trading with the Enemy Act according to law; of and concerning its right to have its business and affairs, and particularly the consideration, administration, determination, and disposition of claims under section 9 of the Trading with the Enemy Act (Comp. St. §' 3115½e), by its Alien Property Custodian and its Attorney General, conducted honestly in its behalf and free from partiality, prejudice, and bias, due to their personal and pecuniary interest in the success of any person or corporation endeavoring to secure the allowance and payment of such claims." The jury convicted the plaintiff in error, and disagreed as to the other defendant on trial, Harry M. Daugherty, an Attorney General of the United States, and later the indictment was dismissed as to him.

[1] To support the judgment, the defendant in error established to the satisfaction of the jury that the plaintiff in error at the times referred to was the Alien Property Custodian, appointed by executive order of the President on March 16, 1921. Harry M. Daugherty was Attorney General of the United States, having been appointed March 4, 1921, and John T. King was active in politics and a friend and intimate of both plaintiff in error and Daugherty. He is named as a conspirator in the indictment. Jess W. Smith, also named as a conspirator, was personally intimate and influential with Miller and Daugherty, and was oftentimes confidential agent and representative of the latter. George E. Williams was an assistant to the plaintiff in error and managing director in the office of the Alien Property Custodian. Adna R. Johnson, Jr., was an assistant Attorney General in charge of the Alien Property Division. Guy D. Goff was an assistant to the Attorney General, and Richard Merton was an officer and director of the Metallbank und Metallurgische Gesellschaft and of the Metallgesellschaft, German corporations.

On February 13, 1918, the then Alien Property Custodian, A. Mitchell Palmer, seized, as enemy owned, by virtue of the Trading with the Enemy Act, 15,180 shares of the capital stock of the American Metal Company, which were held by various individuals for and on behalf of the Metallbank und Metallurgische Gesellschaft, and 18,180 shares of stock which were held by various individuals for and on behalf of the Metallgesellschaft. These shares of stock were placed in two trusts, designated by numbers and in the names of the German corporations. The Alien Property Custodian, on

November 26, 1919, sold this stock for $5,-525,561.41, and deposited the proceeds to the credit of the Treasury of the United States. On September 20, 1921, the Société Suisse pour Valeurs de Metaux, by Merton, one of its directors, filed with the Custodian claims for the delivery to it of the proceeds of these two trusts, which had grown in amount by reason of dividends accrued upon this stock, and which also were deposited with the Treasury of the United States, and were represented in Liberty Bonds, to the extent of the face value of $514,950, and $924,418.56 in cash. This also represented further dividends and interest on the bonds.

The Société Suisse pour Valeurs de Metaux was a Swiss corporation, the majority of the capital stock of which was owned by the German corporations. It claimed that it was a non-enemy corporation, and alleged that in 1910 and 1912 it had purchased and subscribed for the stock of the Metallgesellschaft upon the oral assurance by a predecessor of the Metallbank und Metallurgische Gesellschaft and by the Metallgesellschaft that the stock would not decrease in value. It asserted that, due to the war, the value of the stock of the Metallgesellschaft decreased, with loss to it; that the German corporations orally acknowledged to the Swiss corporation their liability as to this loss, and that to protect the Swiss corporation, and before the declaration of war between the United States and Germany, they orally assigned to the Swiss corporation their right, title, and interest in the shares of stock of the American Metal Company and to all the dividends thereon.

Merton was president of the Metallgesellschaft and chairman of the Metallbank und Metallurgische Gesellschaft, and his family control both corporations. He came to America in March, 1921, and made protest against the seizure of the stock of the American Metal Company. The report of the American Metal Company, through its officers, had announced that this stock was enemy-owned and mentioned the Merton family as the owners. He retained a law firm in New York, and held many conferences with a member thereof, and in less than a month met one of the named conspirators, Mr. King, and discussed with him the claim he desired to present on behalf of the Swiss corporation. He told Mr. King that he came over to gather information as to how the claim should be presented, and asked his advice and assistance in bringing him in contact with persons "who knew the regulations and decisions" and whatever had to be done. Mr.

King promised to think it over. A few days later Mr. King told him he had a friend who was in Washington, with whom he could bring him into contact, and who would give him the information he requested. Several days later he was introduced to Jess Smith by Mr. King. Merton asked Smith for a contact with some one who could tell him "how a claim of this kind had to be drawn up and presented." Smith promised to introduce him to the plaintiff in error, which was later done at a hotel in New York City. Then Merton told plaintiff in error of his anxiety to present the claim of the Swiss corporation, and it was arranged that Merton would go to Washington, where he was to be put in contact with the chief of the department, who would give the necessary information, and from whom he could ask questions.

After this meeting, it was suggested that Merton be no longer represented by his New York law firm, because the member thereof who represented him was not friendly with the plaintiff in error; that no question of law was involved and, by not having a lawyer, Merton would save money. A retainer of $50,000 was asked, to be paid to Mr. King if the claim was acted upon favorably within two months of the filing. This was paid, and the check was cashed by Mr. King, and a promise made to pay 5 per cent. upon the amount recovered within 48 hours after the claim was allowed. Miller signed a letter of September 21st recommending the payment of these funds. Merton had talked with him twice; once, as referred to, at the hotel in New York, and later in the office of the plaintiff in error in Washington, where he had been taken by Jess Smith. On this second occasion, plaintiff in error sent for his assistant, Williams, and turned Merton over to him as the man with whom to talk. An extended conference took place, in which "the basic facts of the claim were discussed," and Merton asked how a claim of this kind should be drawn up. He said he brought no papers from Europe.

After this Merton returned to Europe, and in July, 1921, came back. He again met Mr. King. He was advised to file his claim papers through Smith. The latter come over from Washington to New York to get them, and took them back to Washington. He was advised "that there was something in the papers not in order or missing." Merton went to Washington, where Smith introduced him to Mr. Goff and Mr. Johnson, in the Attorney General's office, and then he went to the Alien Property Custodian's of-

fice, where he found the claim papers already on Williams' table. It was there explained by Williams that "two theories had been mixed up," and that in consequence the claim papers presented "certain features, especially affidavits, things which were illogical." This reference seems to be to inconsistent claims of ownership, and proceeded upon the theory, theretofore presented by Mr. Merton's attorney, that the Swiss corporation was merely a creditor of the German corporation. Thereupon Merton took the papers back with him to Europe, and the papers referred to as illogical were removed, and there was added an express assignment of the stock by the German corporation to the Swiss bank corporation, which was the third in the order of written assignments, but the first to mention the alleged oral transfer at the end of March, 1917, just before the United States' entry into the war. The assignment was executed August 31, 1921.

Merton says he returned to Europe and made it known there that "there were things which had to be written, redone." He came back to this country in September, 1921, again met Mr. King, went to Washington, and had a conference with Jess Smith, who requested him to keep "in readiness to appear when the people who were deciding or deliberating over our claim needed me to give them any further explanation." He was never called, however, and after two days in Washington, he was told that the claim had been allowed and he could return to New York. Merton urged repeatedly that, "after the claim had been allowed, payment should be made as quickly as possible." The next day plaintiff in error had checks made out for $6,500,000, which were delivered to him, and several days later he put $500,000 in Liberty Bonds out of the possession of the United States and took them to New York without obtaining releases or receipts. On September 30, Merton, King, Smith, and plaintiff in error met and dined at a hotel in New York City, where plaintiff in error delivered the Treasury checks for $6,500,000, which he had brought with him to the dinner. The following day, the $500,000 in Liberty Bonds were divided, some of them unquestionably reaching King, Jess Smith, Daugherty, and plaintiff in error.

There was sufficient evidence to require its submission to the jury as to whether or not the claim of the Swiss corporation was judged on its merits and conscientiously by Daugherty and the plaintiff in error, or whether the passing of the claims was the result of machination in furtherance of the conspiracy charge. A jury might well consider whether or not Williams was influenced by the plaintiff in error in his participation in passing the claim. Whether the omission to ascertain the truth of the allegations of the claim was neglect or intentional omission was also a jury question. The prosecution offered evidence in contradiction of the claims as presented, and such information was available at the office of the Alien Property Custodian, and ordinary diligence and fidelity to duty would have put both the plaintiff in error and Williams on inquiry as to the existence of an answer to the claim advanced of ownership by the Swiss corporation through an oral assignment. Undoubtedly Merton was a co-conspirator. The evidence justified the court in submitting this issue to the jury. His testimony, containing frank admissions of his participation, justifies the position of the government that he was not so much interested in the merits of the claim, whether it be that of a creditor or of title holder to the stock, for he sought and obtained political influence and used money in his efforts to regain these large trust funds possessed by the Alien Property Custodian.

Merton delivered to Mr. King $391,000 in Liberty Bonds on October 1, 1921, the day after the dinner. Later, $50,000 of these bonds were found in brokerage accounts which the plaintiff in error had in Wilmington, Del., and in New York. One-third was traced to Mr. King's account, and two-thirds to the Daugherty and Jess Smith accounts. Plaintiff in error put in no defense and attempted no explanation for the receipt of these securities. The bonds which were traced to plaintiff in error were five bonds, of $10,000 each. They reached him through the possession of dummies. Some of these bonds were traced to a brokerage firm in New York, not all having been pledged on the same day. Later they were sold, and stock of the General Motors Company delivered in exchange to the plaintiff in error. These shares of stock were traced to a brokerage firm in Wilmington, Del., for deposit in an account there owned by him. No explanation is made why bonds of this character were held in the names of dummies, men closely associated with him. Twenty thousand dollars of the bonds were exchanged for 1,000 bonds of the Federal Reserve Bank in Philadelphia. A personal friend of the plaintiff in error accomplished this. After some of these bonds were deposited by the plaintiff in error in his brokerage account in Wilmington, Del., and New York, the pro-

ceeds were paid to him. Later one thousand shares of stock of the General Motors Company were purchased for his account with these funds. It was established that the plaintiff in error was in New York on the morning when the $391,000 in Liberty Bonds were delivered to Mr. King at a banking house in New York City, and Jess Smith was also in New York City. Both resided in Washington. It was an unusual errand and an extraordinary assemblage of these men at a hotel, at which the plaintiff in error, in person, delivered such a large sum of money over a dining table. It was indicative of the scheme which existed. It exhibited no prudent caution for the government's business. On the contrary, it indicated a desire to be personally present at the time of the division of the bribe money, which was proved beyond question to have reached plaintiff in error.

The claims of the Swiss corporation were filed September 20, 1921, with the Custodian; they were transmitted to the Attorney General with letters recommending their allowance, signed by the Custodian, on September 21st, and on the 23d of September orders and letters directing their payment were transmitted by the Attorney General's office to the Custodian. The claim of the Swiss corporation contains 80 printed pages. It is indeed suspicious that a claim of this magnitude, both in money and allegations, could have been seriously studied or investigated in but a day in the Alien Property Custodian's office, and but two days in the Attorney General's office, and it was apparent from the proof, and the jury might well have found, that there was no investigation. No investigation is recited in the letters of the Custodian transmitting it to the Attorney General, or the Attorney General returning it approved to the Custodian. The claims were allowed on September 23, 1921, and on the following Monday, September 26th, the checks were received from the Treasury of the United States, drawn to the order of a bank in New York City as attorney in fact for the Swiss corporation. At this time no releases had been obtained from the claimant, and it will be noted that Merton, who received the checks, was not in any way connected with the bank which is referred to as the attorney in fact. Receipts and releases were not obtained from this bank until October 1st. On September 29th, the Custodian delivered to the bank in Washington, for transmission to the bank in New York as attorney in fact for the Swiss corporation, $510,000 in Liberty Bonds. The nature of

this claim should easily have called attention of the Custodian to the need of a thorough investigation. The shares of stock of the American Metal Company were seized in January, 1918, after officers of that company made known to the government that they were enemy-owned. It was not until September 20, 1921, that these claims were filed.

The basis of the claim depended upon a verbal determination arrived at the end of March, 1917, concerning an alleged verbal declaration said to have been made in 1910 by representatives of the two German corporations to the Swiss corporation, to the effect that they guaranteed the value of the shares and the amount of the dividends of such shares, which shares helped to uphold the value of an issue of debentures in the sum of $3,600,000 by the Swiss corporation and said to have been sold to Swiss citizens. The theory was that "the liability of the two German companies should take tangible form in holding for the Swiss company their respective interests in the stock of the American Metal Company." The claims recite that at some unstated time this stock was set aside and the beneficial ownership transferred to the claimant. There was never a written assignment or any symbolic delivery. It is also of note that the stock of the American Metal Company, rather than the stocks of other overseas corporations, which the German corporations owned, were used as the means to satisfy this verbal guaranty. The reason advanced, that they were regarded as not being subject to the hazards of war, is not supported by the fact that it was made in March, 1917, for it was in February, 1917, the United States severed diplomatic relations with the German government and gave its ambassador his passports.

Another inconsistent fact is that these shares, found to be worth nearly $6,500,000 at a forced sale and paying dividends, should have been pledged as collateral for debentures of the Swiss corporation amounting to $3,-600,000. It further appears that the German corporations made an assignment to a Swiss banking corporation of their ownership in the stock on November 20, 1919. This is inconsistent with the claim that they had assigned the same, with all their rights and interests, to the Swiss corporation in March, 1917. And on July 4, 1921, the German corporations delivered to the Swiss bank a confirmation of title. It was in the same month that Merton came to the United States with the explanation that two theories of the claim had been mixed up; that is, ownership title of the stock and the claim to it in satisfaction

of a debt to the amount of the debentures, and brought forth his statement that "the claim papers contained features and affidavits which were illogical."

The jury may have found that these facts were known to the Alien Property Custodian's office, for it was there pointed out by Williams that there was an inconsistent claim of ownership. The claim papers were removed from the office, and a new assignment, prepared August 21, 1921, was brought back to the United States by Merton in September, 1921, and was formally filed on September 20th. These inconsistencies and contradictions of claims would have led a reasonable investigator to have thoroughly investigated, rather than to have passed them with no investigation. The inference, fairly for the jury to have taken, was that it was a dishonest claim and that the plaintiff in error knew it. Merton was a director of the Swiss corporation, as well as president of the German corporations, and this appeared on the face of the claim. He was an enemy alien and an interested emissary, presenting the claim finally, not through an attorney at law, but by virtue of political contact which he made, and this should have aroused a conscientious public official's caution and inquiry. It all stands out in stern contrast with the substance of the claim and method of presentation by the attorney first retained by Merton in New York. The willingness to help, the facility and ease with which suggestions were made and accepted, and the rapidity with which the claim was allowed after Mr. King and Jess Smith became interested, were significant features. The reversal of attitude in the Custodian's office, and the personal interest of the plaintiff in error in the haste to accomplish the allowance of the claim, were all circumstances for the jury's determination as to whether or not the conspiracy charged existed. This interest in speed and accomplishment is illustrated by the telegram sent by the secretary of the plaintiff in error to the Custodian in out of town places, when he was away from Washington.

As these claims were passing through the Custodian's office, there was a claim on behalf of one Greutert for 20 shares of stock of the American Metal Company, which was part of the shares seized as belonging to the Metallbank. These 20 shares had been allotted to Greutert by the Metallbank in writing, and there was a written assent by the bank, executed in 1920, annexed to the claim. His claim was submitted to the plaintiff in error's assistant the month that Mer-

ton and his lawyer first called at the Custodian's office. Then the assistant to the plaintiff in error wrote a letter to the American Metal Company, stating that in all such claims proof in the form of original documents showing the actual transfer of title prior to October 6, 1917, had been required by the Attorney General, and hence the Attorney General would not regard the proof as a sufficiently definite confirmation of this title. The Attorney General's office wrote the Custodian's office in relation to this claim that there was not sufficient evidence as to the sale. The written assent of the Metallbank in November, 1920, and annexed to Greutert's claim, asserted that the bank was then the owner of what the Custodian had seized as its property. This claim was not examined while the claims of the Swiss corporation were passing through the Custodian's office. At least it gave notice to the Custodian that, as late as November, 1920, the Metallbank was asserting title to part of the stock which Merton was representing as having been verbally assigned to the Swiss corporation. The refusal to recognize the Greutert claim stands out in significant contrast to the allowance of the claim of the Swiss corporation, based upon an alleged oral assignment.

There were papers in the files of the Custodian's office in 1921, which are referred to as the Beaty and Bruere papers. These told of a trip to Europe with the assent of the Custodian, under license of the War Trade Board, for the purpose of negotiating with the two German companies for the purchase of the stock of the American Metal Company as its then owner. The contract for the acquisition of the stock was made with the German corporations, but was never fulfilled, because the War Trade Board refused to approve it. The papers on file were additional proof contradicting the claim of the Swiss corporation.

[2] Upon this proof there was but one course for the trial judge to pursue, and that he followed by submitting the evidence to the jury, for its determination of whether or not the conspiracy charged in the indictment had been established beyond a reasonable doubt. Its verdict is conclusive with us.

[3] The argument is advanced that the indictment fails to state facts constituting a crime. The claim is that there was no defrauding of the United States, unless there has been some fraud practiced upon this plaintiff in error, charged with carrying out the governmental intention, and unless the decision arrived at to turn over these trust

funds was wrong. It is said that, since the two officials who were to make the decision participated in the conspiracy, there was no fraud practiced upon them, and that the indictment does not in terms charge that the claim of the Swiss corporation was invalid, and it must be assumed to be valid, and therefore the government was not defrauded. But the charge of the indictment is not that the Custodian and the Attorney General were defrauded. The fraud and deception charged were practiced upon the United States. It was defrauded of its right to have disinterested and conscientious service, and out of property of which it had possession and dominion, and to which it had the power to assert and maintain title. The Attorney General and the Custodian had promised, under oath, to protect the rights of the government and to give it conscientious service. If the facts established a fraud, and the jury was so satisfied, and the government was deprived of any of these, there was dishonesty and false dealing, and it was cheated and defrauded. As said in Hammerschmidt et al. v. United States, 265 U. S. 182, 188, 44 S. Ct. 511, 512 (68 L. Ed. 968):

"It is not necessary that the government shall be subjected to property or pecuniary loss by the fraud, but only that its legitimate official action and purpose shall be defeated by misrepresentation, chicane, or the overreaching of those charged with carrying out the governmental intention."

That a fraud might be practiced upon the government by showing that a cabinet officer so conducted himself in making contracts and leases that it was impossible for him to give loyalty and fidelity to serve the interests of his employer—the United States—has recently been announced in Pan-American Co. v. United States, 273 U. S. 456, 47 S. Ct. 416, 71 L. Ed. 734, and Mammoth Oil Co. v. United States, 48 S. Ct. 1, 72 L. Ed. ——, decided October 10, 1927, by the Supreme Court. In our own court we recently held, in Falter v. United States, 23 F.(2d) 420, decided January 9, 1928, that a government official could and did defraud and cheat the United States, by depriving it of its dominion as an owner and its freedom of contract, by falsely stating and acting as if the government was obligated by contract, when, in fact, it was not. This conspiracy was an attempt to obstruct and defeat the carrying out of the lawful duties of the Attorney General and the Alien Property Custodian. The chicane and deceit practiced impaired, obstructed, and defeated the lawful functions of the government, and the

persons responsible therefor, even though they be incumbents who should officially carry out these governmental functions, violated section 37 of the United States Criminal Code (18 USCA § 88), when they conspired for such a purpose. Haas v. Henkel, 216 U. S. 462, 30 S. Ct. 249, 54 L. Ed. 569, 17 Ann. Cas. 1112.

The indictment sufficiently alleges, and there is proof to sustain the allegations, that the stock, after seizure and sale, resulted in there being deposited with the Treasury of the United States, subject to the order of the Alien Property Custodian, $514,958 in Liberty Bonds and cash by the payment of dividends on the stock of $924,418.58. It is charged that, through the conspiracy, these moneys and bonds went to Merton. In order to have the funds thus created taken from the possession and safe-keeping of the Treasury of the United States, it was necessary to have an honest claim therefor, which, after due examination, was approved by the Custodian and the Attorney General. It was not until then that an order should have been made for its payment to a claimant. What this plaintiff in error did impaired, obstructed, and defeated the lawful functions of these departments of the government, and while it might have been easier for him, as incumbent of one of the positions, to by chicane overreach its lawful functions, and the governmental intention concerning his office and duties, that did not in the slightest relieve him from criminal responsibility. The United States was defrauded of its right to a conscientious administration of its duties pursuant to its laws, and any conspiracy which deprived it unlawfully of that, or its possession and dominion over these funds, was an interference with its property rights, and was a fraud practiced upon it. United States v. Biggs, 211 U. S. 507, 29 S. Ct. 181, 53 L. Ed. 305; Cagle v. United States (C. C. A.) 3 F.(2d) 746; Rumely v. United States (C. C. A.) 293 F. 532; Hodgskin v. United States (C. C. A.) 279 F. 85; Baker v. United States (C. C. A.) 276 F. 283; Stearns v. United States (C. C. A.) 152 F. 900; Curley v. United States (C. C. A.) 130 F. 1.

But it is argued that the indictment concedes the validity of the Swiss corporation's claim, and therefore, if fraud was practiced, it was irrelevant in the premises. Such contention results from misreading the indictment. On the contrary, the indictment charges a conspiracy that intentionally, and in the expectation of reward and without proper investigation the plaintiff in error allowed an

illegal and suspicious claim presented in violation of the statute, all as part of the conspiracy to defraud the United States. United States v. Keitel, 211 U. S. 370, 29 S. Ct. 123, 53 L. Ed. 230; Browne v. United States (C. C. A.) 290 F. 870; Gouled v. United States (C. C. A.) 273 F. 506; Salas v. United States (C. C. A.) 234 F. 842.

[4] Error is assigned because of the denial of the motion to direct a verdict for plaintiff in error for the reason that the prosecution of the offense was barred by section 1044 of the United States Revised Statutes (18 USCA § 582). It provides that no person shall be prosecuted, tried, or punished for any offense not capital, except as provided in section 1046 (18 USCA § 584), unless the indictment is found or the information is instituted within three years next after the offense has been committed. This statute, however, was amended in November, 1921, 42 Stat. 220. It now contains a proviso that, in offenses involving the defrauding or attempts to defraud the United States or any agency thereof, whether by conspiracy or not, and in any manner, and now indictable under any existing statutes, the period of limitation shall be six years. This indictment was found three years after the commission of the offense charged, but within six years.

It has been held that perjury under section 125 of the United States Criminal Code (18 USCA § 231), for false swearing as to income tax return, is not within the proviso, and that such an indictment must be found within three years. But this was because the word "involved" limits the proviso of the statute to a case where defrauding or attempts to defraud is an ingredient under the statute defining the offense. Defrauding the United States was not an ingredient in the crime of perjury, as defined in section 125 of the Criminal Code. United States v. Noveck, 271 U. S. 201, 46 S. Ct. 476, 70 L. Ed. 904. The court said there that the purpose of the proviso is to apply the six-year period to every case in which defrauding or an attempt to defraud the United States is an ingredient under the statute defining the offense. The language of the proviso is broad, and was evidently intended to cover all offenses, where defrauding or attempting to defraud the United States is an element of the crime as defined in the statute creating the offense, except in cases of offenses existing under the revenue laws, which are expressly excepted from the operation of section 1044. Section 37 of the Criminal Code couples the word "defraud" with the phrase "in any manner." The proviso makes clear its comprehensiveness in emphasizing

and enlarging by the phrase "whether by conspiracy or not," and by the further words "now indictable under any existing statute."

A successful conspiracy, which defrauds the United States of its governmental rights or property, is an offense involving the defrauding of the United States, whether by conspiracy or not. Hammerschmidt v. United States, supra; United States v. Owen et al. (D. C.) 32 F. 534. The six-year period under the statute applies to a conspiracy to withhold and defraud the proceeds of a sale of the property of the United States which constitutes the crime of embezzlement. Weinhandler v. United States (C. C. A.) 20 F.(2d) 359. Also of depriving the United States of its right to contract for the sale of its goods at a higher market value by falsely stating that the outstanding contracts had not been filled, and that therefore the buyer under such contracts was entitled to receive new disposable goods as they came in at prices fixed by the contract. Falter v. United States (C. C. A. 2d Circuit) decided January 9, 1928, 23 F.(2d) 420. The Supreme Court held in United States v. McElvain, 272 U. S. 633, 47 S. Ct. 219, 71 L. Ed. 451, that a charge of conspiracy to defraud the United States in respect to internal revenue laws was limited to the three-year period of the statute of limitations. There it pointed out that all the offenses under the internal revenue laws are expressly excepted from section 1044. That was a charge of conspiracy to make a false income and profit-sharing return for 1920.

The argument of the plaintiff in error is that there are two species of conspiracy— first, conspiracy to defraud; and, second, conspiracy to commit an offense—both defined in section 37 of the Criminal Code, and that the conspiracy to defraud the United States is not within the proviso, but the conspiracy to commit an offense, if it involves defrauding the government and is itself a substantive offense, is within the proviso. It is argued that the decision in the McElvain Case supports this view. We cannot agree with this contention. The constructive fraud in the case was only the secondary and possible consequences of the offense disclosed, and it was made clear in the opinion that the proviso was not intended to relate to matters touching the internal revenue laws.

In the case at bar the facts show a conspiracy which contained every ingredient recognized as fraudulent. The act of conspiracy constituted a fraud upon the government to cheat it of its lawful rights. The overt acts charged in furtherance of the conspiracy, and essential to the statutory crime of con-

spiracy, showed a consummated fraud as against the government and the property rights of the United States. The act in the McElvain Case was the filing of a false income tax return, which was a crime under the internal revenue laws, even though no cheating of the United States ever occurred. The court in that opinion said, in effect, that conspiracies to commit offenses are not within section 1044, when the ultimate offense which is the object of the conspiracy is excepted from the operation of section 1044, and, on the other hand, a conspiracy to commit objective offenses included in section 1044 would be governed by the proviso. The offense here charged falls within the proviso, and there were six years after its commission in which to indict and prosecute for a violation of section 37.

[5] There are six overt acts laid in the indictment. At the trial, three were eliminated, and the three remaining are now challenged as insufficient overt acts done to effect the objective defrauding specified in the indictment. The acts alleged are that Mr. King received from Merton a check on the Chase National Bank of $50,000; that on September 30, 1921, plaintiff in error gave to Merton two checks, amounting to $6,453,979.97, and that on October 1st Mr. King received from Merton Liberty Bonds of the par value of $391,000. The argument is that the conspiracy was one to obstruct and interfere with a governmental function to bring about the allowance of the claim, and it is said that the moment the claim was allowed the alleged conspiracy was consummated and fulfilled, and a defrauding was effected, and that after events have a value as evidence, but could not be overt acts. The conspiracy was one, not merely to secure the allowance of the claims, but to defraud the United States by procuring the payment of the money and to transfer the bonds to the Swiss corporation, "whereby the United States was to be and was defrauded of its possession and dominion of a large fund under its administration." The indictment also charged that, for the purpose of the conspiracy to defraud the United States of its governmental functions, the honest, impartial, unbiased, and unprejudiced service and judgment of its officials was taken from it by fraud, with a view of enrichment of the conspirators, and the giving and taking of the money, as alleged in the overt acts, were all acts to effect the object of the conspiracy and consummate the conspiracy. Whether these acts did so or not were jury questions. They were steps among many which entered into the conspiracy and to its fulfillment.

[6] It is argued that, because the jury disagreed as to Daugherty, charged as a conspirator, as a matter of law the conviction of the plaintiff in error of the offense cannot stand. The part charged to have been played by Daugherty was not in allowing the claims, but in facilitating their allowance. The jury may have acquitted him, and still the conviction of the plaintiff in error of conspiring with the others named could stand. The substance and object of the conspiracy remain the same, whether or not Daugherty was a conscious participant in it. The disagreement of the jury as to Daugherty can be interpreted merely as a failure to convince each of the twelve men of his guilty connection with the charge beyond a reasonable doubt. Steckler v. United States (C. C. A.) 7 F.(2d) 59; Marshallo v. United States (C. C. A.) 298 F. 74; Carroll v. United States (C. C. A.) 16 F.(2d) 951.

[7] At the trial, the court admitted in evidence records of the Custodian's office as in contradiction of the claims of the Swiss corporation, which records were available to the plaintiff in error and his assistants. Errors are assigned for the reception of this evidence. The theory of the prosecution was that the claims were hastily allowed, without investigation and proper determination, and as evidence of the conspiracy and in furtherance thereof these papers were received. A question was then presented, for the jury's determination, of whether or not the conduct of the plaintiff in error could reasonably be accounted for, or whether there was an intentional omission of proper investigation which involved lack of fidelity on the part of the plaintiff in error. It was proper for the government to offer in evidence records available to the plaintiff in error and his assistant, which were contrary to the allegations of the claims filed by the Swiss corporation. The court admitted evidence of the so-called Beaty and Bruere papers. Beaty and Bruere were officers of the American Metal Company. In January, 1918, they received a license to negotiate with the German corporations, and undertook such negotiations in Switzerland with Merton, representing the German corporations. The documents were contracts with the German owners of the American Metal Company's stock, and contemplated its purchase and the elimination of the German interests. These papers were on file in the Custodian's office in September, 1921, and were accessible. They were contradictory to the claim of the Swiss corporation.

The Greutert claim papers were filed in December, 1920, as to 20 shares of stock of the American Metal Company; part of

J5,180 shares seized as belonging to the Metallbank. This was submitted to Williams personally in April, 1921. This, too, was in contradiction of the Swiss claim, and in confirmation of the claim of the government that the property was German-owned. The court, in its instruction to the jury, stated that the plaintiff in error could not be charged with the information contained in any papers in his office, if he did not personally know of their presence there and their contents, and that this was so, even though the jury should find that he had thereafter received the money or bonds for having done his duty. No just complaint can be made of this charge, in view of the contents of these documents and knowledge by the Custodian's office that they were filed there. Ordinary diligence and fidelity to duty would have required an examination of them, rather than a hasty passing of so large a claim. Of course, if the plaintiff in error corruptly intended to aid this conspiracy, and intentionally omitted an examination or investigation, he could be held to the knowledge that there were on hand documents from which he could have learned or known that there were admissions and statements by the German corporations that they owned part of the stock. In charges of conspiracy to defraud, there is usually no direct evidence of the corrupt arrangement, and, where neither of the conspirators are called as witnesses, the question is always open for the jury as to what the circumstances disclosed proved as to the truth or falsity of the charge. Mammoth Oil Co. v. United States, 48 S. Ct. 1, 72 L. Ed. ——, decided October 10, 1927, by Supreme Court; Nee v. United States (C. C. A.) 267 F. 84; Hamburg-American Steam Packet Co. v. United States (C. C. A.) 250 F. 747.

[8] What was said by Merton to Williams was competent evidence—indeed, direct proof. Merton was charged to be a conspirator, and consequently all his acts and declarations while the conspiracy was being carried on were admissible. Williams was representing the plaintiff in error in the transaction, to the knowledge of the plaintiff in error, and the conversations in relation to the transaction had between the two were admissible.

[9] Nor was error committed in admitting the telegram sent by the plaintiff in error to his secretary in September, 1921, and the telegrams sent by his secretary to him at about the same time. It all went to establish exceptional and significant personal interest in the passage of the claims and the speed with which it was accomplished.

Errors are assigned for refusals to instruct the jury as requested by the plaintiff in error. The learned trial judge very carefully and efficiently instructed the jury at length and with exceptional clearness as to the rules of law which were to guide them in their deliberation as to the guilt or innocence of the accused. The plaintiff in error presented 66 requests to charge. The majority were charged in the phrase requested. We have examined those which received modifications in the court's charge, and find that the substance was charged and the rule of law applicable carefully expounded. Of these requests, Nos. 36, 43, 47, and 58 are called to our attention because of the refusal to charge in the language requested. We have examined these, and find no warrant for the claim that the plaintiff in error has not had that fair and impartial trial which should be accorded him. Throughout the trial the court zealously protected his every right. He has been convicted of a conspiracy which brands him as unfaithful to a trust imposed upon him in high office, where his government had the right to expect fidelity and conscientious performance of duty. We have examined industriously to discover in this voluminous record any error which would justify any different conclusion than that here arrived at, but there is none; and it follows that the judgment must be affirmed.

Judgment affirmed.