**UNITED STATES of America, Plaintiff,**

v.

**Michael G. MORGAN, Defendant.**

**No. 3:93 CR 00212 (TFGD).**

United States District Court,
D. Connecticut,
Waterbury Division.

Jan. 21, 1994.

---

Kari A. Pedersen, Asst. U.S. Atty., Office of U.S. Atty., Bridgeport, CT, for plaintiff.

Hope C. Seeley, Hubert J. Santos, Santos, Peck and Smith, Hartford, CT, for defendant.

## RULING ON DEFENDANT'S MOTION TO DISMISS AND FOR DISCLOSURE OF GRAND JURY MINUTES

DALY, District Judge.

In this prosecution for misapplication of bank funds and bank fraud the defendant Michael G. Morgan ("Morgan") moves to dismiss the indictment, or a portion thereof, on three grounds. Morgan claims that the indictment (1) violates his Fifth Amendment right against double jeopardy; (2) relies on an unconstitutional ten-year statute of limitations period and exceeds the applicable five-year statute of limitations period; and (3) is the result of improper and excessive use of hearsay testimony. Morgan also claims that count one of the indictment should be dismissed because the grand jury was not adequately instructed regarding the elements of the crime of misapplication of bank funds, and moves for disclosure of the grand jury minutes to further substantiate these claims. For the reasons set forth below, the motion is denied in its entirety.

## BACKGROUND

The instant indictment arises out of Morgan's alleged activities as President and Chief Executive Officer of Charter Federal Savings and Loan Association ("Charter"), a federal savings and loan institution that opened for business in May 1984. That same year Charter established the Bedford Equities Corporation ("BEC") for the purpose of developing real estate, and the Bedford Equities 1984 Limited Partnership ("BELP"), a real estate investment concern. BEC was the general partner of BELP. From its inception until August 1989 the qualifying deposits of Charter were insured by the Federal Savings and Loan Insurance Corporation ("FSLIC"), and the bank was under the regulatory jurisdiction of the Federal Home Loan Bank Board ("FHLBB"). The Office of Thrift Supervision ("OTS") assumed the

interests of the FHLBB in August 1989, and in April 1990 the OTS informed Morgan that he was the subject of an investigation into the activities of Charter, BEC and BELP. On June 29, 1990 the OTS seized Charter's assets.

On January 19, 1993, and following a lengthy investigation, the OTS filed a "Notice of Charges and Hearing for an Order to Cease and Desist and to Direct Restitution and Other Affirmative Corrective Action and Notice of Intention to Prohibit" ("Notice") against Morgan. Because Morgan's first argument in the instant motion concerns the claim that the settlement constituted punishment for the same offense, the charges set forth in the Notice will be detailed here. The first charge of the Notice alleged that Morgan, as Charter's Chief Executive Officer and a member of Charter's Board, voted in favor of extending a $1,995,000 loan to BELP for the purchase of property at 1200 Summer Street ("Summer Street") in Stamford, Connecticut. The Notice alleges that Morgan supported the loan without disclosing to Charter, BEC or BELP that he would receive $67,500 of a $75,000 brokerage commission paid by BELP to Samuel Boyarsky ("Boyarsky"). The Notice charges that as a result Morgan was unjustly enriched and caused loss or other damage to BEC in the amount of $67,500.

The second charge of the Notice accused Morgan of various illegalities in the purchase of an office building at 30 Buxton Farms Road ("Buxton Farms") in Stamford. At Morgan's direction BEC purchased Buxton Farms in November 1985 for $10,270,000. Prior to that transaction William Malloy ("Malloy") suggested to Morgan that BEC sell the property to Arthur Beloff ("Beloff") and Sol Terkeltaub ("Terkeltaub") for $11,-500,000. This sale occurred in September 1986, and Malloy allegedly received a brokerage commission of $200,000. Further, Beloff and Terkeltaub were able to purchase this property because they obtained $3,300,000 in unsecured loans from Charter, which classified them as consumer rather than commercial real estate loans. Had the loans been properly classified Charter would have ex-

ceeded the regulatory limit on commercial loans to individual borrowers. The false classification further allowed Charter and BEC to show a $1,700,000 pre-tax profit on the Buxton Farms transaction, without reflecting the fact that Charter had extended $3,300,000 in unsecured credit for the purchase. Beloff and Terkeltaub ultimately defaulted on their obligations to Charter and, pursuant to a workout agreement, Charter took title to Buxton Farms and forgave $2,900,000 of their debt. Beloff and Terkeltaub executed a promissory note to Charter in the amount of $1,420,000 for the balance, but failed to maintain payments. Charter as a result suffered a loss in excess of $1,000,-000.

The third charge of the Notice alleges that Morgan, in addition to directing BEC to pay Malloy the $200,000 brokerage commission for the Buxton Farms transaction, directed that this fee improperly be deferred from 1986 to 1987 to improve Charter's balance sheet for fiscal year 1986. The payment was structured to appear as though it was part of a transaction for property located at 159 Franklin Street ("Franklin Street") in Stamford (outlined below), and was made through Brian Egan, a "straw" party, to disguise the actual payment to Malloy. The Notice further alleges that this payment was made to enable Malloy to satisfy two loans Charter made to him in 1986 and 1987.

The fourth charge of the Notice alleges that Morgan committed further improprieties in connection with the purchase and sale of the Franklin Street property. Specifically, the Notice alleges that BEC and BVD Affiliates sold the Franklin Street property to Burt Hoffman ("Hoffman") for $2,000,000. Simultaneous with and as part of this transaction, Charter loaned $3,475,000 to Hoffman

at a favorable rate of interest, of which $1,600,000 was disbursed to fund a portion of the Franklin Street purchase price. Charter subsequently disbursed $450,000 to Hoffman for the balance on September 30, 1987. Charter records allegedly falsely stated that the purpose of the $450,000 disbursement was the development of other land previously purchased by Hoffman. The loan also allegedly violated federal regulations limiting the amount a bank may loan to an individual borrower for. a single development project. Charter listed a gain of $713,000 on the sale of Franklin Street in its records, but as Hoffman defaulted on his loans Charter ultimately lost in excess of $1,000,000.

Morgan and the OTS settled all charges contained in the Notice on January 19, 1993. The Consent Order called for Morgan to pay the sum of $1,800,000, *See* Consent Order, ¶ 3(a), (b), to submit personal financial records on every yearly anniversary of the Consent Order until the amounts set forth in ¶ 3 are paid, *id.* ¶¶ 4–6, 7, 8, and cease his participation in the affairs of financial institutions. *Id.* ¶¶ 2, 9.

The government brought the instant prosecution against Morgan on September 22, 1993 through the filing of a six-count indictment. The government concedes the indictment is based upon the conduct that formed the basis of the civil proceedings initiated by the OTS.[1] Morgan now moves to dismiss the indictment.

## DISCUSSION

### I. *Double Jeopardy Claim*

■ Morgan first claims that the indictment violates his Fifth Amendment right to be free from double jeopardy. Morgan argues that the $1,800,000 settlement reached

---

1. *See* Govt's Opp.Mem., 3. Count one of the indictment charges Morgan with misapplication of bank funds in connection with the Summer Street transaction, in violation of 18 U.S.C. § 657. Count two charges Morgan with bank fraud and aiding and abetting in connection with the Buxton Farms transaction, in violation of 18 U.S.C. §§ 1344 and 2, while count three charges Morgan with misapplication of bank funds and aiding and abetting through a $115,000 payment to a consultant in connection with the Summer Street and Buxton Farms transactions. Count

four again charges Morgan with misapplication of bank funds and aiding and abetting through an $85,000 payment to a fictitious broker in connection with the Summer Street and Buxton Farms transactions, while count five charges Morgan with bank fraud and aiding and abetting in connection with the Franklin Street transaction. Finally, count six charges Morgan with misapplication of bank funds and aiding and abetting through the $400,000 disbursement to Hoffman in connection with the Franklin Street transaction.

as a result of the OTS investigation constitutes punishment for conduct for which he cannot again be prosecuted. The double jeopardy clause of the Fifth Amendment provides that no person "shall ... be subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const. amend. V. The double jeopardy clause protects against three distinct abuses: a second prosecution for the same offense after acquittal; a second prosecution for the same offense after conviction; and multiple punishments for the same offense. *United States v. Halper*, 490 U.S. 435, 440, 109 S.Ct. 1892, 1897, 104 L.Ed.2d 487 (1989). Morgan seeks to invoke this third prohibition. The Court therefore must determine whether the Fifth Amendment prohibits the government from prosecuting Morgan for conduct that was the subject of the settlement with the OTS.

Morgan relies heavily on *Halper*, which involved a civil action following a criminal conviction. The defendant in *Halper* was convicted of submitting sixty-five false Medicare claims and was sentenced to two years' imprisonment and a fine of $5,000. The total amount of the loss to the government was $585. The government then brought a civil action under 31 U.S.C. § 3729, the civil false claims act, exposing Halper to a civil fine of $2,000 per count, or $130,000. The trial court imposed a $16,000 fine on Halper, holding that a greater fine would constitute a second punishment under the Fifth Amendment. The Supreme Court agreed with this analysis, holding that "[w]here a defendant previously has sustained a criminal penalty and the civil penalty sought in the subsequent proceeding bears no rational relation to the goal of compensating the Government for its loss, but appears to qualify as 'punishment' in the plain meaning of the word, then the defendant is entitled to an accounting of the Government's damages and costs to determine if the penalty sought in fact constitutes a second punishment." 490 U.S. at 449, 109 S.Ct. at 1902.[2] The Court limited this holding, however, to "the rare case ... where a fixed-penalty provision subjects a prolific but small-gauge offender to a sanction overwhelmingly disproportionate to the

damages he has caused." *Id.; see also United States v. Amiel*, 995 F.2d 367, 369 (2d Cir.1993). Morgan argues that the terms of the OTS settlement constitute punishment under *Halper* for the conduct alleged in the Notice, and therefore the double jeopardy clause precludes any subsequent criminal indictment for that conduct.

■ As a preliminary matter, the government contends that the limited holding in *Halper* cannot extend to a criminal prosecution that follows a civil proceeding. *See* Govt's Opp. at 4–5. Although the Second Circuit has not addressed this issue directly, *see Amiel*, 995 F.2d at 370, decisions in other circuits have found that the sequence of the proceedings is immaterial to a *Halper* analysis. *See, e.g., United States v. Sanchez–Escareno*, 950 F.2d 193 (5th Cir.1991) ("[T]he *Halper* principle that a civil penalty can be factored into the double jeopardy matrix should apply whether the civil penalty precedes or follows the criminal proceeding."); *United States v. Mayers*, 897 F.2d 1126, 1127 (11th Cir.) (*per curiam* ) ("the *Halper* principle ... would seem to apply whether the civil penalties come before or after the criminal indictment"), *cert. denied*, 498 U.S. 865, 111 S.Ct. 178, 112 L.Ed.2d 142 (1990), *appeal after remand*, 957 F.2d 858 (11th. Cir.1992); *see also United States v. Marcus Schloss & Co., Inc.*, 724 F.Supp. 1123 (S.D.N.Y.1989) ("If ... a civil sanction may fairly be characterized only as a deterrent or retribution ... then its exaction before imposition of criminal punishment should have the same double jeopardy effect as exaction afterwards."). The Court finds these decisions persuasive and applies the *Halper* analysis to this action.

■ Morgan's claim under *Halper* requires that the Court determine whether the OTS settlement constituted a prior punishment. Although "even remedial sanctions carry the sting of punishment," the Supreme Court cautioned against construing punishment from the perspective of the defendant. 490 U.S. at 447 n. 7, 109 S.Ct. at 1901 n. 7; *see also Sanchez–Escareno*, 950 F.2d at 202. Further, the labels "civil" and "criminal" are

---

2. Morgan concedes that an accounting is not

necessary in this case. *See* Deft's Mem., 8.

not of paramount importance. Rather, in determining whether a civil sanction constitutes criminal punishment, the Court must look to the purposes actually served by the sanction and not the underlying nature of the proceeding. *Halper,* 490 U.S. at 447 n. 7, 109 S.Ct. at 1901 n. 7. In short, a civil as well as a criminal sanction constitutes punishment when the sanction as applied in the individual case serves the purposes of retribution and deterrence, the twin goals of punishment. *Id.* at 448, 109 S.Ct. at 1901. Civil sanctions, therefore, do not retain their civil character if they are used to attain these goals. *United States v. Certain Real Property and Premises,* 954 F.2d 29, 36 (2d Cir. 1992). *Halper* thus requires the Court to determine whether the settlement amount agreed to by Morgan and the OTS is justified "by the civil and remedial purposes it ostensibly serve[d], or whether it or a portion thereof can be explained only with reference to punitive goals." *Id.*

▪ An examination of the Stipulation and Consent to Issuance of Consent Order, the Consent Order, and the Consent Judgment entered into between Morgan and the OTS reveals that restitution and an agreement not to participate in the affairs of any financial institutions were the only goals of the OTS proceeding. *See* Stipulation and Consent to Issuance of Consent Order, ¶ 10 (The "Stipulation and Consent, the Order, [Morgan's] payment of restitution contemplated as part of the Order, and the forbearance of the OTS to initiate and maintain administrative proceedings against [Morgan] settle only the charges set forth in the Notice. . . ."); *id.* at ¶ 12 (setting forth agreement that Morgan's "obligation to make the payment of restitution pursuant to the Stipulation and Consent and the Order" cannot be discharged in bankruptcy); *see also* Consent Order ¶ 3, 14 (setting forth agreement that Morgan's "obligation to reimburse against loss under paragraph 3 of this Order is his sole and separate obligation and will not be reduced by payments made to any other entity other than the OTS").

Although the Notice claimed that Charter sustained a loss in excess of $2,275,000, the Consent Judgment of $1,800,000 constituted a compromise concerning the amount of the Charter loss attributed to Morgan's actions. *See* Kenneth Cureton Affid., ¶ 8. The Stipulation and the Consent Order attribute no other basis for the settlement. Indeed, the settlement documents specifically provide that the "Stipulation and Consent, the Order, and [Morgan's] compliance with the Order, do not compromise, settle, dismiss, resolve, or in any way affect . . . any civil or criminal claims, actions, or charges against or liability of [Morgan] or any other individual or entity asserted by any governmental entity other than the OTS." *See* Stipulation and Consent to Issuance of Consent Order, ¶ 11. As the OTS settlement was for remedial, not punitive purposes, and as Morgan was aware that the settlement did not extinguish the possibility of subsequent criminal prosecution, the settlement does not constitute punishment within the context of the Fifth Amendment. Accordingly, to the extent the instant motion asserts a claim under the double jeopardy clause, it is hereby denied.

## II. *Grand Jury Improprieties Claims*

Morgan next moves to dismiss count one of the indictment on the ground the grand jury was not properly instructed on the elements of the crime of misapplication of bank funds, and further argues that the entire indictment should be dismissed because the government improperly relied on excessive hearsay during the grand jury proceedings. Morgan requests disclosure of the grand jury minutes, pursuant to Federal Rule of Criminal Procedure 6(e)(3)(C)(ii), in furtherance of these claims.[3]

### A. *Insufficient Instructions*

▪ Morgan must support his claim by setting forth specific facts in order to obtain disclosure of the grand jury minutes under Rule 6(e)(3)(C)(ii). *See United States v. Ab-*

---

3. Rule 6(e)(3)(C)(ii) provides that "[d]isclosure otherwise prohibited by this rule of matters occurring before the grand jury may also be made . . . (ii) when permitted by a court at the request of the defendant, upon a showing that grounds may exist for a motion to dismiss the indictment because of matters occurring before the grand jury." Fed.R.Crim.P. 6(e)(3)(C)(ii).

*casis,* 785 F.Supp. 1113, 1119 (S.D.N.Y.1992). Morgan also must overcome the strong presumption of regularity in grand jury proceedings, a presumption that cannot be outweighed by conclusory or speculative allegations of misconduct. *Id.; see also Hamling v. United States,* 418 U.S. 87, 139 n. 23, 94 S.Ct. 2887, 2918 n. 23, 41 L.Ed.2d 590 (1974); *United States v. Santoro,* 647 F.Supp. 153, 173 (E.D.N.Y.1986). Disclosure thus will be denied in all but extraordinary circumstances. *Costello v. United States,* 350 U.S. 359, 364, 76 S.Ct. 406, 409, 100 L.Ed. 397 (1956).

■■■ Morgan first seeks disclosure in support of his motion to dismiss count one, which charges him with misapplication of bank funds in connection with the Summer Street transaction. Morgan claims that the government failed to instruct the grand jury correctly on the element of intent when seeking an indictment on this count. The applicable statute provides that "[w]hoever, being an officer, agent or employee of or connected in any capacity with ... [a] savings and loan corporation ..., embezzles, abstracts, purloins or willfully misapplies any monies, funds, credits, securities or other things of value belonging to such institution, or pledged or otherwise intrusted to its care" shall be guilty of a felony. 18 U.S.C. § 657. The government must prove four elements to establish a violation of this statute: (1) that the defendant is an officer, agent or employee of the bank; (2) that the deposits of the bank are insured by the Federal Deposit Insurance Corporation; (3) that the defendant knowingly and willfully misapplied the funds of the bank; and (4) that the defendant acted with the intent to injure or defraud the bank. *See United States v. Castiglia,* 894 F.2d 533 (2d Cir.1990); *United States v. Clark,* 765 F.2d 297 (2d Cir.1985).[4] Thus although section 657 does not specify an intent requirement, the Second Circuit has long held that intent is a necessary element of the offense. *Clark,* 765 F.2d at 302; *United States v. Docherty,* 468 F.2d 989 (2d Cir. 1972). The element is met if the bank officer intends that his conduct subject the bank to

some risk of pecuniary loss, *Clark,* 765 F.2d at 303, or if the natural effect of the officer's conduct put the bank in jeopardy of loss, regardless of whether such loss actually occurs. *Castiglia,* 894 F.2d at 537–38.

Morgan claims that the $75,000 brokerage commission paid to Boyarsky for the Summer Street transaction came from the funds of BELP, not Charter. He contends that his actions were never intended to place Charter at pecuniary risk, and indeed had no such effect, and thus the necessary element of intent was not met. He therefore asserts that a properly instructed grand jury never could have returned an indictment on count one.

■■■ This claim fails, however, for two reasons. First, the risk of loss and the source of the funds from which Boyarsky was paid are factual issues properly left for determination by a jury at trial. Second, it is well settled that an indictment returned by a legally constituted grand jury, if valid on its face, is sufficient to call for a trial on the merits. *Costello,* 350 U.S. at 363, 76 S.Ct. at 408; *Abcasis,* 785 F.Supp. at 1119. Morgan's claim fails to overcome the strong presumption of regularity in grand jury proceedings and thus, to the extent his motion seeks to dismiss count one, and seeks disclosure of the grand jury minutes pertaining to that count, it is hereby denied.

### B. *Excessive Use of Hearsay*

Morgan next moves to dismiss the indictment on the ground that the government improperly relied on excessive hearsay in obtaining the indictment. Morgan asserts that evidence first was presented to a grand jury in 1990, yet a grand jury did not return an indictment until September 1993, evidencing the fact that more than one grand jury was impaneled. Morgan also requests disclosure of the grand jury minutes, pursuant to Rule 6(e)(3)(C)(ii), in furtherance of this claim.

---

4. Though *Clark* involves the interpretation of 18 U.S.C. § 656, the elements under the 18 U.S.C. § 657 are the same. *See United States v. Davis,* 953 F.2d 1482, 1492–93 n. 15 (10th Cir.1992); *United States v. Musacchio,* 940 F.2d 486, 491 n. 6 (9th Cir.1991).

■ Although there is no prohibition on the use of hearsay evidence in grand jury proceedings, extensive reliance on hearsay testimony is disfavored. *United States v. Hogan,* 712 F.2d 757, 761 (2d Cir.1983); *see also United States v. Estepa,* 471 F.2d 1132 (2d Cir.1972); *United States v. Liebowitz,* 420 F.2d 39 (2d Cir.1969). Nonetheless, a grand jury may base its indictment wholly upon hearsay, and dismissal is required only when necessary to protect the integrity of the judicial process. *Liebowitz,* 420 F.2d at 42. This may result if the defendant can show that there is a "high probability" that an indictment would not have been returned had the indictment been based on direct evidence rather than on hearsay. *Id.*

■ Morgan's claim amounts only to conjecture that the delay between the beginning of the grand jury process and the return of the indictment necessitated the use of hearsay evidence. Morgan has not alleged with specificity, however, any facts on which the Court could find that there existed a "high probability" that the indictment would not have been returned had it not been based on hearsay. This argument therefore also fails to overcome the presumption of regularity in grand jury proceedings, and accordingly his motion to dismiss the indictment and for disclosure of grand jury minutes on this ground is denied.

## III. *Ex Post Facto Claim*

■ Morgan next claims that the indictment must be dismissed because it violates the ex post facto clause of Article I, Section 9 of the United States Constitution.[5] Specifically, Morgan claims that a ten-year statute of limitations, passed subsequent to the crimes alleged in the indictment, cannot constitutionally be applied to him because the indictment was returned after the end of the original five-year limitations period.[6] The Financial Institution Reform and Recovery Act ("FIRREA"), which became effective on August 9, 1989, extended the statute of limitations for various offenses affecting financial institutions from five to ten years.[7] Further, Public Law 101–73 provides that "the amendments made by [subsection (a) of FIRREA] shall apply to an offense committed before the effective date of this section, if the statute of limitations applicable to that offense under this chapter had not run as of such date." Pub.L. No. 101–73, § 961(*l*)(3).

While the Second Circuit has not ruled directly on the constitutionality of this amendment, courts in other circuits have found the amendment valid. *See United States v. Brechtel,* 997 F.2d 1108 (5th Cir. 1992); *United States v. Madia,* 955 F.2d 538, 540 (8th Cir.1992); *United States v. Taliaferro,* 979 F.2d 1399, 1402 (10th Cir.1992). Morgan, however, urges the Court to apply the Supreme Court's holding in *Beazell v. Ohio,* 269 U.S. 167, 46 S.Ct. 68, 70 L.Ed. 216 (1925). The *Beazell* Court held that "any statute which punishes as a crime an act previously committed, which was innocent when done; which makes more burdensome the punishment for a crime, after its commission, or which deprives one charged with crime of any defense available according to the law at the time when the act was commit-

---

**5.** The ex post facto clause provides that "[n]o Bill of Attainder or Ex Post Facto Law shall be passed." U.S. Const. Art. I, § 9. An ex post facto law is one which punishes an act previously committed which was innocent when done; or which makes the punishment of a crime more burdensome after its commission; or which deprives a person charged with a crime of any defense which was available according to law at the time the offense was committed. *See Beazell v. Ohio,* 269 U.S. 167, 46 S.Ct. 68, 70 L.Ed. 216 (1925).

**6.** The date of the crime with which Morgan is charged in count one is October 25, 1984; in count two, June 1988; in count three, December 15, 1987; in count four, June 10, 1988; in count five, June 30, 1988; and in count six, September

29, 1987. Thus, to be timely under the five-year statute of limitations, the indictment had to have been returned in this case by October 25, 1989 on count one; by June 30, 1993 on count two; by December 15, 1992 on count three; by June 10, 1993 on count four; by June 30, 1993 on count five; and by September 29, 1992 on count six. The indictment in the instant case actually was returned on September 22, 1993. Hence the indictment exceeds a five-year limitations period on all counts.

**7.** FIRREA provides that "[n]o person shall be prosecuted, tried, or punished for a violation of ... [18 U.S.C. §§ ] 657 [or] 1344 ... unless the indictment is returned or the information is filed within 10 years after the commission of the offense." *See* 18 U.S.C. § 3293.

ted, is prohibited as Ex Post Facto." 269 U.S. at 169–70, 46 S.Ct. at 68. The ex post facto clause thus only prohibits enactment of statutes that (1) criminalize an act previously committed that was innocent when committed; (2) enhance the penalties for a crime after its commission; or (3) deprive a defendant of any defense available according to law when the act was committed. *Brechtel,* 997 F.2d at 1113 (citing *Collins v. Young-blood,* 497 U.S. 37, 41, 110 S.Ct. 2715, 2718, 111 L.Ed.2d 30 (1990)). Morgan argues that the third circumstance exists in the instant case, as the enactment of the ten-year limitations period set forth in FIRREA deprives him of the defense that the grand jury returned the indictment after the expiration of the five-year limitations period previously in effect.

■■■ Morgan's reliance on *Beazell* is misplaced, however, as his argument ignores the Supreme Court's decision in *Collins.* In *Collins* the Court clarified the *Beazell* Court's description of a "defense available ... at the time when the act was committed," holding that this defense was "linked to the prohibition on alterations in 'the legal definition of the offense' or 'the nature or amount of the punishment imposed for its commission.'" *Id.* at 41, 110 S.Ct. at 2718. Thus only statutes that withdraw defenses relating to the definition of a crime, or that involve matters that a defendant might plead as justification or excuse, fall into this latter group. *See id.; see also Brechtel,* 997 F.2d at 1113. An extension of the statute of limitations period neither criminalizes previously innocent conduct nor enhances the punishment for an existing crime, and therefore *Beazell* does not apply. *See Brechtel,* 997 F.2d at 1113 (citing *Collins,* 497 U.S. at 41, 110 S.Ct. at 2718).

■■■ This interpretation is in accord with the principles set forth in *Falter v. United States,* 23 F.2d 420 (2d Cir.), *cert. denied,* 277 U.S. 590, 48 S.Ct. 528, 72 L.Ed. 1003 (1925). In *Falter,* Judge Learned Hand held that "Congress ... has the power to extend the period of limitations without running afoul of the Ex Post Facto Clause, provided the [original] period has not already run." *Id.* at 425–26. The Fifth Circuit in *Brechtel,* and the

courts of other circuits that have addressed this issue directly, relied on Judge Hand's decision in *Falter* in finding the amendment in 18 U.S.C. § 3293 to not violate the ex post facto clause. *See Brechtel,* 997 F.2d at 1113, n. 7; *Madia,* 955 F.2d at 540; *Taliaferro,* 979 F.2d at 1402.

As noted above, the grand jury returned the indictment in the instant case on September 22, 1993. As Congress enacted the limitations period in 18 U.S.C. § 3293 on August 9, 1989, two months prior to October 25, 1989, the earliest applicable expiration date of the original five-year limitations period, the ten-year limitations period set forth in FIRREA does not violate the ex post facto clause. Accordingly, Morgan's motion to dismiss the indictment on this ground also is denied.

### CONCLUSION

For the reasons stated above, the defendant's motion to dismiss the indictment and for disclosure of the grand jury minutes is hereby DENIED.

SO ORDERED.